STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. DONALD
MASINO, DEFENDANT-RESPONDENT.

Argued April 18, 1983—Decided October 19, 1983.

*Linda K. Calloway,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

*M. Virginia Barta,* Assistant Deputy Public Defender, argued the cause for respondent (*Joseph H. Rodriguez,* Public Defender, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

In the early morning hours of an autumn Sunday defendant pulled L.F. from her car, beat her, dragged her across the road, across a stretch of grass, behind a cluster of trees, and down an embankment to a pond. There he struck her, sexually assaulted her, plunged her head repeatedly into the pond, took her clothes,

and left her by the water's edge naked, senseless, and near-drowned. The question presented is whether, in addition to the crimes of assault for which he was convicted, defendant was correctly convicted of kidnapping pursuant to *N.J.S.A.* 2C:13–1(b). We conclude that the conviction for kidnapping should stand. Moreover, the statute's requirement that the kidnapper remove his victim "a substantial distance from the vicinity where [the victim] is found" addresses the very risk of increased harm occasioned by this abduction.

At 2:00 a.m. on September 23, 1979 L.F. and her friend Cindy went to a disco club, where a man later identified as the defendant asked L.F. to dance. She accepted, but soon changed her mind because she was too tired. Because defendant said he felt insulted, L.F. apologized and invited him to accompany Cindy and her for coffee. Defendant, in his car, followed L.F. and Cindy in the victim's car. On the way Cindy changed her mind about the coffee and asked L.F. to drive her home. After leaving Cindy, L.F. pulled out from Cindy's driveway and drove a short distance down the road to where defendant had parked. L.F. rolled down her window and told defendant she had decided to go home, whereupon defendant asked for directions to the Garden State Parkway. Moments later he entered the passenger door of L.F.'s car and began kissing her. She rebuffed him and insisted that she had to go home. Defendant got out but reappeared on the driver's side, announced "O.K. bitch, now you're going to get it," punched her several times in the face and tried to pry her from her grasp on the steering wheel. Weakened by the blows, L.F. finally let go and alighted from the car. She tried to flee across the road toward Cindy's house but defendant caught her, thrashed her, and warned he would kill her if she made any noise. He dragged her back across the street and down to the pond where he threatened to drown her as he repeatedly thrust her face under water. He then ripped off some of her clothes, sexually assaulted her, beat her again, stripped her completely, and fled with her clothes. L.F. crawled to the street and searched in vain for Cindy's house. After

running naked down several streets she finally located her friend's house, from where the police were called.

A jury convicted defendant of, among other things, kidnapping, *N.J.S.A.* 2C:13–1(b), terroristic threats, *N.J.S.A.* 2C:12–3, aggravated assault, *N.J.S.A.* 2C:12–1(b)(1), and aggravated sexual assault, *N.J.S.A.* 2C:14–2(a)(3). The kidnapping statute, *N.J.S.A.* 2C:13–1, reads:

a. *Holding for ransom, reward or as a hostage.* A person is guilty of kidnapping if he unlawfully removes another from the place where he is found or if he unlawfully confines another with the purpose of holding that person for ransom or reward or as a shield or hostage.

b. *Holding for other purposes.* A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:

(1) To facilitate commission of any crime or flight thereafter;

(2) To inflict bodily injury on or to terrorize the victim or another; or

(3) To interfere with the performance of any governmental or political function.

c. *Grading of kidnapping.* Kidnapping is a crime of the first degree and upon conviction therefor a person may, notwithstanding the provisions of 2C:44–1 f., be sentenced to an ordinary term of imprisonment between 15 and 30 years. If the actor releases the victim unharmed and in a safe place prior to apprehension, it is a crime of the second degree.

d. *"Unlawful" removal or confinement.* A removal or confinement is unlawful within the meaning of this section and of sections 2C:13–2 and –3 if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14 or is incompetent, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.

Unlike other first degree crimes, which carry a sentence exposure of 10 to 20 years, kidnapping calls for a sentence of between 15 and 30 years. *N.J.S.A.* 2C:13–1(c).

In its charge the trial court instructed the jury that to convict defendant of kidnapping it had to find that defendant had moved his victim a "substantial distance." The court defined "substantial" as "an ample or considerable amount, quantity, size and so forth * * * " but added that "substantial" referred to a "relative" distance that must have some "bearing on the evil at hand."

The Appellate Division reversed and vacated the kidnapping conviction. Noting that "[t]here was no evidence of the distance defendant moved [the victim] except that it was across the street and to a nearby pond", the court said that while "substantial distance" is normally a jury question, this case presented insufficient evidence from which a jury could make such a finding. Implicit in that holding is the idea that a kidnapping prosecution can fail as a matter of law solely because the distance of the abduction is too small. The court below did, however, find sufficient evidence to support a conviction for criminal restraint (which the trial court had merged into the kidnapping conviction) and remanded for sentencing on that count. We denied defendant's petition for certification, 93 *N.J.* 241 (1982), but granted certification, on the State's petition, 93 *N.J.* 240 (1982), to consider whether the Appellate Division correctly vacated the kidnapping conviction. We reverse.

## II

Blackstone defined kidnapping as the "forcible abduction or stealing away of a man, woman, or child from their own country and sending them into another." 4 W. Blackstone, *Commentaries* * 291. From approximately 1790 to 1898 New Jersey's kidnapping statute followed Blackstone's definition but broadened its reach by adding that removal could be from this state into another state or country. In 1898 the law was changed to provide that kidnapping occurred when the asportation of the victim was to any point within this state, or into another state or country. The immediate predecessor to our current kidnapping law, *N.J.S.A.* 2A:118–1, reads in part:

> Any person who kidnaps or steals or forcibly takes away a man, woman or child, and sends or carries, or with intent to send or carry, such man, woman or child to any other point within this state, or into another state, territory or country * * * is guilty of a high misdemeanor, and shall be punished by imprisonment for life, or for such other term of not less than 30 years as the court deems proper.

In discussing the asportation requirement of common law kidnapping the drafters of the Model Penal Code recalled that

the removal of the victim from the protection of his friends and his sovereign was kidnapping's prime danger. Asportation out of the state or country contemplated a displacement significant "not only because of the distance and difficulties of repatriation, but especially because the victim was removed beyond the reach of English law and effective aid of his associates." Model Penal Code § 212.1 Comment (Tent. Draft No. 11, 1960), at 13 [*Draft*]. According to the drafters, the original concept of kidnapping was expanded because, among other reasons, experience had demonstrated that "distance and isolation could be achieved within the realm, and that even distance was not essential to isolating a victim from the law and his friends." *Id.* Thus the common law asportation requirement evolved so that the asportation began to signify more than distance; it signified isolation and vulnerability to continued harm. The forlorn state of the victim remained the paramount evil of kidnapping.

The elimination of the requirement that the victim be moved a fixed distance gave rise to such highly questionable results as convictions for kidnapping when the victim was forced to move from room to room as a robber ransacked his house. For instance, in *People v. Chessman,* 38 *Cal.*2d 166, 192, 238 *P.*2d 1001, 1017 (1951), the court construed the phrase "kidnaps or carries away" to mean the act of forcibly moving the victim any distance whatever, no matter how short or for what purpose, declaring that "[i]t is the fact, not the distance of forcible removal which constitutes kidnapping in this State." In *People v. Wein,* 50 *Cal.*2d 383, 326 *P.*2d 457 (1958), the court found kidnapping by a defendant who, in the course of robbing and raping several women in their respective homes, forced them to move from room to room, sometimes as little as five feet.

This approach rendered the asportation requirement meaningless. Worse, it meant that kidnapping's harsh sentence, even when the movement constituting the "kidnapping" was simply incidental to the underlying crime of rape or robbery, was available to state public outcry or prosecutorial zeal. The potential for abusive prosecution became evident.

California abandoned the *Chessman/Wein* line of cases in *People v. Daniels,* 80 *Cal.Rptr.* 897, 459 *P.2d* 225, 71 *Cal.*2d 1119 (1969), which involved a series of rapes and robberies. The defendants in that case would enter a victim's apartment, force her at knifepoint to another room, rob her and rape her. The court reversed the kidnapping convictions on the ground that the movement in the defendants' crimes was an integral part of the underlying rape or robbery. The court, however, did not attempt to define asportation in quantitative terms such as distance or duration; it held that the asportation must substantially increase the risk of harm over and above that necessarily present in the underlying rape or robbery, and must not be merely incidental to the rape or robbery. 80 *Cal.Rptr.* at 910, 459 *P.*2d at 238, 71 *Cal.*2d 1119.

New York's approach to the asportation requirement similarly fluctuated. In *People v. Florio,* 301 *N.Y.* 46, 92 *N.E.*2d 881 (1950), the court affirmed kidnapping convictions of defendants who had lured a woman to their car, driven from Manhattan to Queens, and then raped her. While conceding that "detention inevitably occurring during the immediate act of commission of such a crime as rape or robbery would not form a basis for a separate crime of kidnapping," the court held that the circumstances of the case warranted conviction. *Id.* at 48–49, 92 *N.E.* 2d at 882.

Several years later, in *People v. Levy,* 15 *N.Y.*2d 159, 256 *N.Y.S.*2d 793, 204 *N.E.*2d 842 (1965), the Court of Appeals strictly construed the asportation requirement in reversing kidnapping convictions of defendants who had accosted a husband and wife, forced them into a car, and driven 27 blocks in a 20 minute span while robbing them. The court noted that the breadth of kidnapping "could literally overrun several other crimes, notably robbery and rape, and in some circumstances, assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes * * *. It is a common experience in robbery, for example, that the victim be confined briefly at gunpoint or bound and detained, or moved

into and left in another room or place." *Id.,* at 164, 256 *N.Y.S.*2d at 796, 204 *N.E.*2d at 844. The court then overruled *Florio* and limited the "application of the kidnapping statute to 'kidnapping' in the conventional sense in which that term has now come to have acquired meaning." *Ibid.*

More recently, in *People v. Miles,* 23 *N.Y.*2d 527, 540, 297 *N.Y.S.*2d 913, 922, 245 *N.E.*2d 688, 695, *cert.* den.; 395 *U.S.* 948, 89 *S.Ct.* 2028, 23 *L.Ed.*2d 467 (1969), the New York Court of Appeals elucidated its *Levy* holding:

> In short, the *Levy* * * * rule was designed to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal. *It was not designed to merge "true" kidnappings into other crimes merely because the kidnappings were used to accomplish ultimate crimes of lesser or equal or greater gravity.* Moreover, it is the rare kidnapping that is an end in itself; almost invariably there is another ultimate crime. [Emphasis added]

New Jersey was once quite expansive in its concept of kidnapping and ostensibly followed the *Chessman/Wein* rule. In *State v. Dunlap,* 61 *N.J.Super.* 582 (App.Div.1960), *cert.* den., 368 *U.S.* 903, 82 *S.Ct.* 181, 7 *L.Ed.*2d 97 (1961), the court cited *Chessman* in holding that kidnapping occurred when the defendants dragged the victim from her parked car into theirs and raped her while driving around the immediate vicinity of the abduction. The Court found no requirement that the victim be taken to any specific destination. 61 *N.J.Super.* at 589. The Law Division in *State v. Kress,* 105 *N.J.Super.* 514, 522 (1969), cited *Chessman* for the proposition that any movement satisfied the asportation requirement. In that case, however, the defendant bank robber used his victim as a shield, a distinguishing feature of that case and one specifically covered under section (a) of the current statute. In *State v. Ginardi,* 111 *N.J.Super.* 435 (App. Div.1970), *aff'd o.b.,* 57 *N.J.* 438 (1971), the defendant forced his way into the victims' car, and while one victim drove, he raped the other. This atrocity continued for 1½ hours over "substantial distances," 111 *N.J.Super.* at 440, a circumstance that obviated the necessity of the court deciding whether asportation for a slight distance incidental to the underlying crime would ever be enough to establish kidnapping. *Id.* at 441.

This Court squarely addressed the elements of kidnapping in *State v. Hampton*, 61 *N.J.* 250 (1972). The victim in that case had just entered her apartment when the defendant crept up behind her, forced her to leave the apartment and to drive him around the town and its environs for about an hour. When she tried to escape, he shot her. The Court upheld his kidnapping conviction:

> In the present case we are satisfied that the conviction for kidnapping was justified. Defendant's act in forcing Mrs. Rayborn to leave her apartment at gun point and to drive him in her car about the countryside at night for about an hour, frequently threatening her with being shot, and in fact causing her to believe he intended to shoot her to the point where in her fright she did risk death to get out of the car, was not an integral part of the commission of the single crime of breaking and entering. The forcible detention could reasonably be considered a separate event deliberately undertaken and warranting separate prosecution. *The asportation and detention were not incidental to the underlying crime, and they substantially increased the risk of harm to the victim beyond that normally inherent in breaking and entering. Under the circumstances, the jury was justified in finding guilt of the separate crime of kidnapping.* [61 *N.J.* at 175–76 (emphasis added).]

The asportation issue arose again in *State v. Wooten*, 135 *N.J.Super.* 6 (App.Div.1975), *aff'd by equally divided court*, 73 *N.J.* 317 (1977). During a prison riot an inmate dragged a corrections officer 700 feet from one floor of the prison to another and then held him hostage for 24 hours. The court affirmed the kidnapping conviction because the kidnapping was the underlying crime, not incidental to another crime, and because the victim's status as hostage obviated an analysis in terms of distance. 135 *N.J.Super.* at 11–12, 342 *A.2d* 549. The dissenters in this Court felt that the dragging of the officer from one point to another within the same building did not satisfy the requirement that the victim be moved "to any other point within this state," *N.J.S.A.* 2A:118–1, a requirement not found under our current statute.

As noted above, a literal application of the *Chessman/Wein* rule allowed for abusive prosecution. The drafters of the Model Penal Code, after which our criminal code is modeled, wrote, "[t]he criminologically non-significant circumstance that the victim was detained or moved incident to [an underlying] crime

determines whether the offender lives or dies." *Draft, supra,* at 14. Accordingly, the drafters required that the victim be moved a "substantial" distance, and that he be moved from the "vicinity" rather than the "place" where he is found so as "to preclude kidnapping convictions based on trivial changes of location having no bearing on the evil at hand." *Draft, supra,* at 16. This philosophy likewise shaped the drafting of our kidnapping statute. See *Final Report of the New Jersey Criminal Law Revision Commission, vol. II: Commentary* (1971) (Commentary). It is clear, however, that neither the Model Penal Code nor *N.J. S.A.* 2C:13–1(b) contemplated "substantial distance" as a linear measurement. The isolation of the victim was viewed as the heart of the offense. *Draft, supra,* at 16.

In attempting to ascertain what our legislature envisioned as a "substantial distance" we can begin by noting what is not meant: a movement is not "substantial" simply because it facilitates a crime. As applied to this case, *N.J.S.A.* 2C:13–1 requires that the victim be moved a substantial distance *and* that the movement facilitate a crime. To interpret movement in terms of facilitating a crime would be tautological.

More sensible is the interpretation that views a "substantial distance" as one that isolates the victim and exposes him or her to an increased risk of harm. The drafters of the Model Penal Code focused on such isolation:

> [I]f the offense is properly defined so as to be limited to substantial isolation of the victim from his normal environment, it reaches a form of terrifying and dangerous aggression not otherwise adequately punished * * *. A disposition to violence or theft in an actor who takes the trouble to set the scene so that he will have a relatively free hand to deal with his isolated victim is obviously more likely to lead to more dangerous consequences. [*Draft, supra,* at 15.]

Pennsylvania, which has also adopted the Model Penal Code's language in its kidnapping statute, analyzed the phrase "substantial distance" in *Commonwealth v. Hughes,* 264 *Pa.Super.* 118, 399 *A.*2d 694 (Pa.Super.1979). The defendant in that case forced the victim into his car and drove two miles to a woods where he raped her. Noting that the definition of "substantial"

could not be "confined to a given linear distance nor a certain time period," *id.* at 121–123, 399 *A.*2d at 696, the court held that "the legislature intended to exclude from kidnapping the incidental movement of a victim during commission of a crime which does not substantially increase the risk of harm to the victim." *Id.* at 125, 399 *A.*2d at 698.

We believe our legislature adopted *N.J.S.A.* 2C:13–1 with the same intent. We arrive at this conclusion by weighing the potential for abusive prosecution against the terror of kidnapping and against the increased risk of harm to isolated victims. The above-mentioned comments from the drafters of the Model Penal Code buttress this conclusion. Any argument that our legislature intended to soften its treatment of kidnappers is foreclosed by reference to an early draft of 2C:13–1, subsequently rejected, that discussed a downgrading provision: "We propose to maximize the kidnapper's incentive to return the victim *alive* by making first degree penalties apply only when the victim is not 'released alive in a safe place' * * *. Certainly those formulations which authorize extreme penalties unless the victim is 'liberated unharmed' are unsatisfactory * * *." *Commentary, supra,* at 187 (emphasis added). As it turned out, of course, the legislature did ultimately authorize first degree sentences of 15 to 30 years unless the victim was released *unharmed. N.J.S.A.* 2C:13–1(c). It is evident that the legislature intended harsh treatment for kidnappers; it is further evident that by maximizing the kidnapper's incentive to return the victim unharmed, the legislature realized that the risk of harm attendant upon isolation is the principal danger of the crime.

It would certainly be convenient to fix a linear distance for asportation. It would also be arbitrary and irrational, especially when juxtaposed with kidnappings from a home or business, removal from which has no requisite "substantial distance." See *N.J.S.A.* 2C:13–1(b).

■ We hold that one is transported a "substantial distance" if that asportation is criminally significant in the sense of being more than merely incidental to the underlying crime. That determination is made with reference not only to the distance travelled but also to the enhanced risk of harm resulting from the asportation and isolation of the victim. That enhanced risk must not be trivial.

■ Applying those principles to this case, we are satisfied that a jury could have properly determined that the defendant removed his victim a substantial distance. By dragging her from the roadside to the pond's edge behind a row of trees defendant isolated her and arguably obtained a "free hand to deal with his isolated victim." *Draft, supra* at 15. After assaulting and threatening to drown L.F., defendant stripped her, thereby impeding her ability to follow him from the area and call attention to her plight. She was left beaten, exposed to the elements, and hidden from passersby.

■ The trial court's charge to the jury, while not a paragon of clarity, allowed the jury fair consideration of these factors. It referred to the distance as being "relative" and instructed that the movement had to have some "bearing on the evil at hand." In determining that the charge under scrutiny did not fall so far short of the test we have made explicit today as to amount to reversible error, we emphasize that a more punctilious charge in the future should explain "substantial distance" in terms of sufficient criminal significance that is more than incidental to the underlying crime and that substantially increases the risk of harm to the victim. The jury should be instructed that if the victim is removed only a slight distance from the vicinity where he or she is found and such movement does not create the isolation and increased risk of harm that are at the heart of *N.J.S.A.* 2C:13–1(b), then it should not convict.

Furthermore, we underscore the need for strict adherence by prosecutors and trial courts to the elements of kidnapping examined in this opinion. Today's decision is not to be read as a

crack in the door against overzealous or creative prosecution for kidnapping nor as encouragement for use of a kidnapping charge as some sort of "bonus" count in an indictment.

So much of the judgment of the Appellate Division as reversed the kidnapping conviction is reversed, and the judgment of conviction of kidnapping is hereby reinstated.

*For reversal* —Chief Justice WILENTZ, and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance* —None.