925 A.2d 71 (2007)
394 N.J. Super. 28
STATE of New Jersey, Plaintiff-Respondent,
v.
William PURNELL, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 20, 2007.
Decided June 18, 2007.
*73 Yvonne Smith Segars, Public Defender, attorney for appellant (M. Virginia Barta, Assistant Deputy Public Defender, of counsel and on the brief).
Paula T. Dow, Essex County Prosecutor, attorney for respondent (Joan E. Love, Assistant Prosecutor, of counsel and on the brief).
Before Judges SKILLMAN, LISA and GRALL.
The opinion of the court was delivered by
LISA, J.A.D.
Defendant, William Purnell, was convicted of kidnapping and related sexual assault and weapons offenses and sentenced to an aggregate term of twenty-five years imprisonment with an 85% parole disqualifier under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.
Prior to trial, because of concerns about defendant's competency to stand trial, the judge ordered him committed to Ann Klein Forensic Center (AKFC) for a competency evaluation. The report issued by a psychiatrist at AKFC asserted a lack of cooperation by defendant, noted that he "may be feigning or malingering illness or incompetence," and concluded that "no determination can be made whether [defendant] is competent to stand trial." A competency hearing was held. The psychiatrist was the only witness. He could not offer an opinion to a reasonable degree of medical certainty whether defendant was or was not competent to stand trial. When pressed by the judge, he ventured an "educated guess" that defendant was competent. The judge found that the State carried its burden of establishing defendant's competency, and defendant was tried, convicted and sentenced.
Defendant now appeals and argues:
POINT I
IN VIEW OF THE DOCTOR'S TESTIMONY THAT HE COULD ONLY "GUESS" AT DEFENDANT'S COMPETENCY, THE TRIAL COURT'S FAILURE TO QUESTION THE DEFENDANT PERSONALLY, AND DEFENDANT'S *74 ACTIONS DURING TRIAL, THE COURT VIOLATED DEFENDANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW IN FINDING DEFENDANT COMPETENT TO STAND TRIAL.
POINT II
BECAUSE THE COURT ERRONEOUSLY DENIED DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON KIDNAPPING BY UNLAWFUL CONFINEMENT, AND CHARGED BOTH UNLAWFUL CONFINEMENT AND UNLAWFUL REMOVAL AS A BASIS FOR THE KIDNAPPING OFFENSE, THE COURT VIOLATED DEFENDANT'S RIGHT TO JURY UNANIMITY AND DUE PROCESS OF LAW. (Partially Raised Below)
POINT III
THE COURT ERRED IN FAILING TO MERGE THE UNLAWFUL POSSESSION OF A KNIFE CONVICTION INTO THE POSSESSION OF THAT SAME KNIFE FOR AN UNLAWFUL PURPOSE.
Our review of the record leads us to conclude that the evidence at the competency hearing did not support the finding that the State proved defendant's competence to stand trial. We therefore reverse the conviction and remand for a new trial if, after an appropriate inquiry into defendant's competency, he is found fit to stand trial. We further agree with defendant that with respect to the kidnapping charge, the evidence did not warrant submission to the jury of the "unlawful confinement" alternative. We will discuss the issue briefly for the trial court's guidance in the event of a retrial. Finally, there is no need for determination of the issue raised in Point III, but we note that the State concedes, and we agree, that the conviction for possession of a knife under manifestly inappropriate circumstances (N.J.S.A. 2C:39-5d) should have been merged with the conviction for possession of the same knife for an unlawful purpose (N.J.S.A. 2C:39-4d). See State v. Jones, 213 N.J.Super. 562, 568, 517 A.2d 1219 (App. Div.1986), certif. denied, 107 N.J. 90, 526 A.2d 167 (1987).

I
On June 3, 2002, at about 3:30 p.m., S.S., a fifth grader who had just passed her eleventh birthday, walked home from school. When she arrived at her apartment building in Bloomfield, she noticed that a man, later identified as defendant, followed her into the building. Defendant was then thirty-one years old.
The building had apartments on three floors. S.S.'s apartment was one of four apartments on the third floor. An open stairway led from the first floor to the third floor and continued one flight above the third floor to a landing where there were no apartments and which provided access to the roof. The access door to the roof was locked.
As S.S. walked up the stairs, she was aware defendant was behind her, and she stepped aside to allow him to pass. However, he did not pass. S.S. hastened her pace, and as she arrived on the third floor near the door to her apartment, defendant grabbed her from behind, placing one hand over her mouth and brandishing a knife with his other hand. He said, "I want your Ps," directed her to go up the next flight of stairs, and threatened to stab her if she screamed. S.S. complied.
When defendant and S.S. arrived on the upper landing, defendant put the knife in his pocket. Defendant unzipped his pants and forced S.S. to perform fellatio for about one minute. He then directed S.S. *75 to turn around, take off her pants and bend down, after which he rubbed his penis against her bare buttocks for about one minute. Defendant did not ejaculate during the entire episode. Defendant then talked to S.S. for about one minute. S.S. described the conversation this way:
He starts talking to me like saying like don't scream and then he said something to me that I don't understand, like he started saying you did this, something like that. I guess he was just like messing with me. And then he said how old I am and I said I was like 11 years old and then he's likehe'sthen he puts his pants back on when he's at the first stair in the space, he asked me how old I am again and I'm like 11 and he says please don't cry like that and then he's like nothing happened, please don't cry and he said when Iwhen I leave you could go back he said.
. . . .
I guess he said oh, I'm sorry, please don't cry, he's like trying to calm me down and everything. And then he's likehe tells me that when I start leaving you can go, when you hear the door like from downstairs.
Defendant then ran down the stairs. S.S. remained on the landing until she saw him reach the bottom floor and heard the door close as he left the building. By her estimate, this took about thirty seconds. She then proceeded down one flight of stairs to her apartment and reported the incident to her mother.
When defendant left the building, the building superintendent and his wife were standing in front of the building. They saw defendant leave the building and observed that he was fixing his pants. S.S.'s mother promptly informed the superintendent about the incident. He called 911 to alert the police. He also chased defendant on foot for about ten minutes before losing sight of him. He informed the police of defendant's direction of travel and provided a description. Within one half hour of the assault, defendant was apprehended. He was brought back to the apartment building, where he was identified by the superintendent, his wife and S.S. No knife was recovered. Defendant was arrested, and has remained in custody ever since.
On November 1, 2002, an eight-count indictment was returned, charging defendant as follows: (1) first-degree kidnapping, N.J.S.A. 2C:13-1b(1); (2) first-degree aggravated sexual assault by an act of oral penetration by fellatio upon a victim less than thirteen years old, N.J.S.A. 2C:14-2a(1); (3) first-degree aggravated sexual assault by an act of penetration by fellatio during the commission of a kidnapping, N.J.S.A. 2C:14-2a(3); (4) first-degree aggravated sexual assault by an act of penetration by fellatio while armed with a knife and threatening by word or gesture to use same, N.J.S.A. 2C:14-2a(4); (5) second-degree sexual assault by engaging in sexual contact with a victim less than thirteen years old by a perpetrator at least four years older, by rubbing her buttocks with his penis, N.J.S.A. 2C:14-2b; (6) fourth-degree possession of a weapon, a knife, under circumstances not manifestly appropriate for lawful uses, N.J.S.A. 2C:39-5d; (7) third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4d; and (8) second-degree (amended to third-degree) endangering the welfare of a child, N.J.S.A. 2C:24-4.
The trial was conducted in November and December 2004. Defendant was convicted on all counts. He was sentenced on May 6, 2005. The judge merged count three with counts one and two and count seven with count four. The judge sentenced defendant on count one to twenty-five years imprisonment with an 85% *76 NERA parole disqualifier. He imposed concurrent sentences on the remaining counts as follows: on count two, seventeen years imprisonment with an 85% NERA parole disqualifier; on count four, seventeen years imprisonment with an 85% NERA parole disqualifier; on count five, eight years imprisonment with an 85% NERA parole disqualifier; on count six, eighteen months imprisonment; and on count eight, four years imprisonment. The judge imposed appropriate periods of parole supervision and assessed all appropriate penalties. He also ordered community supervision for life and sex offender registration.

II
On November 13, 2003, about a year before trial, the trial court entered an order committing defendant to AKFC for a competency evaluation. See N.J.S.A. 2C:4-5. The record lacks detail as to the impetus for the commitment order. Throughout the transcripts of various pretrial proceedings, defense counsel repeatedly raised the issue of defendant's competence, informing the court that, in counsel's view, defendant did not understand the charges or proceedings and was unable to assist in the defense of his case. The judge who ordered the commitment and conducted the competency hearing was not the same judge that later presided over the trial. At the time of sentencing, the competency issue was revisited, and, before sentencing, the defense moved for a new trial, again arguing that defendant was incompetent to stand trial. In the colloquy at that time, the judge noted that the first judge was induced to issue the commitment and examination order based upon defense counsel's representations about defendant's perceived incapacity. Defense counsel acknowledged that those representations were part of the reason, and the first judge also "did a quick voir dire of [defendant] and determined that there was a mental health issue there as based on that quick voir dire." The prosecutor did not disagree.
Defendant was admitted to AKFC on January 22, 2004. Dr. Vinobha Gooriah, a clinical psychiatrist, interviewed defendant on three occasions, February 5, 2004 for one-half hour, March 1, 2004 for one-half hour, and March 18, 2004 for fifteen minutes. Dr. Gooriah issued a report on April 12, 2004, following the standard format for a "court report-competency to stand trial evaluation." In addition to his personal interviews, Dr. Gooriah relied upon discussions with treatment team members and members of the rehabilitation staff, defendant's overall behavior and his interaction on the unit and in rehabilitation as observed by hospital staff, hospital records and psychological assessments made at AKFC, and discovery materials pertaining to the offense.
Dr. Gooriah reported as defendant's past history and social and family history that nothing much was known about defendant, who strongly refused interaction, but he did reveal the identity of his siblings, that his mother had died two years earlier, and his father was living. In this portion of the report, Dr. Gooriah stated that defendant was living with his niece and working as a laborer, and that he had attended school through the eleventh grade in regular classes, when he dropped out to learn masonry at the Job Corps. Further, defendant denied any prior psychiatric involvement and denied past or present use of drugs or alcohol. This portion of the report concluded by stating: "Because of his reluctance to cooperate with the interview, all information provided by him should be taken with a grain of salt."
Reporting on defendant's physical and mental condition on admission, Dr. Gooriah *77 referred to defendant's admission evaluation by Dr. Roth, a psychologist. Defendant told Dr. Roth he had used marijuana for years, possibly on a daily basis, that he had a ninth grade education and was living with his father and unemployed. He denied a history of mental illness. He reported prior incarcerations. Dr. Roth found defendant to be neat, but guarded and belligerent. He found defendant was oriented to time, place and things. He found defendant's affect was flat and apathetic, lacking appropriate intensity. Defendant denied hallucinations. His speech was normal. Dr. Roth questioned the presence of paranoia because defendant was not speaking to anyone in the jail. Defendant's thought process was concrete and he refused to participate in some of the cognitive testing. Defendant's eye contact was avoidant, and his attention and reliability were deemed mixed. Dr. Roth found defendant's insight and judgment impaired and diagnosed defendant on admission with depressive disorder, not otherwise specified.
Dr. Gooriah reported that a psychology note reflected that defendant's understanding was that his AKFC hospitalization was "because `someone wrote it up' and he needed his teeth fix [sic]." The hospital records reflected that defendant was guarded. Defendant denied any prior involvement with the mental health system. He reported three prior arrests for controlled dangerous substance (CDS) offenses and stated that the outcome of those charges was "they let me go."
Dr. Gooriah's report stated that defendant continually refused to undergo competency testing and the necessary testing to determine competency to stand trial, and whether he had a personality disorder, mental retardation or was malingering. A psychology note in the records stated that defendant believed his charges would eventually be dismissed because "not [sic] witnesses against him have appeared." Defendant continually insisted on going back to jail.
Dr. Gooriah reported on his mental status examination. He found defendant guarded and refusing to cooperate with the assessment process, and that he did not show any evidence of abnormal involuntary movement. Dr. Gooriah found defendant well oriented to the three spheres of time, place and things. He found defendant's speech concrete, but goal directed, "whenever he decides to speak, otherwise he would shut down and refuse to continue with a conversation especially at times when he was told that his charges were sexual assault." He found defendant's affect constricted. Under "Attention span & Concentration," he noted that defendant spelled "EARTH" forwards, but refused to spell it backward, saying "it ain't no meaning." Defendant was able to repeat a few digits correctly forwards, but could not repeat them backwards. When asked to do a serial seven subtraction from $100, he declined, stating "if I had $100, I rather keep it."
Dr. Gooriah found defendant's thought processes concrete, but apparently goal directed. As to defendant's thought content, he found that defendant was preoccupied with getting discharged back to the jail, because "they will have to dismiss the charges and send him back home." Defendant denied auditory or visual hallucinations and denied suicidal or homicidal ideation, intent or plan. He showed no overt evidence of paranoia nor that he was reacting to internal stimuli.
As the interview progressed, defendant became defensive and uncooperative. He was unable to spell routine words, a circumstance he tried to mask, telling the examiner, "I'm trying to match your voice," meaning he was attempting to spell *78 words phonetically. Dr. Gooriah determined that defendant's intellectual functioning appeared to be in the low average or borderline range. He was unable to perform IQ testing. He determined that defendant's insight appeared limited and his judgment was fair. He repeated that defendant "reasons that eventually the charges will have to be dismissed against him and that he will [be] let go free."
Defendant was prescribed medications, including Benadryl for insomnia and Zyprexa Zydis for disorder of thought process and possible paranoia. Dr. Gooriah rendered a diagnosis of psychotic disorder, not otherwise specified.
The standard report form for a competency evaluation requires the examiner to assess the criteria for competence to stand trial as set forth in N.J.S.A. 2C:4-4. In doing so, Dr. Gooriah reported that defendant was well oriented to time, place and things. As to defendant's understanding of his "present situation in a court of criminal justice charged with a criminal offense," Dr. Gooriah reported that defendant "believes that he is charged with CDS. When he was confronted with his charges, especially the sexual assault charges, he refused to cooperate further with the interview process." As to defendant's understanding that a judge is on the bench, Dr. Gooriah explained in his report:
Although a graphic representation of how a court system functions was made and the role of the judge, prosecutor, defense attorney, jury and how the court process happens, the patient refused to proceed with the evaluation stating "just send me back to jail, tell them everything is alright" and he walked away, so it is unclear if he understands whether if [sic] there is a judge on the bench.
As to defendant's understanding of the role of a prosecutor and his defense attorney, his right not to testify, and if he testifies that he will be required to tell, to the best of his ability, the facts of what happened, the role of a jury, his right to enter into a plea bargain, the consequences of a guilty plea, and his ability to participate in an adequate presentation of his defense, see N.J.S.A. 2C:4-4, Dr. Gooriah reported that defendant "refuses to cooperate."
Dr. Gooriah noted that defendant "may be feigning or malingering illness or incompetence" because he
can give you chronology of his life situation when he decides to do so. He does understand that he has charges however instead of indicating what his actual charges are he states that his charges are CDS. He also mentioned at one point in time eventually the charges will be dismissed and "they will have to let me go." This, to me, is indication that there is a likelihood of malingering occurring.
Dr. Gooriah concluded his report:
Following the institution of medication no change in [defendant's] behavior had been noted. His guardedness could be paranoia. He is simply refusing to proceed further. Therefore, no determination can be made whether [defendant] is competent to stand trial. . . .
[Emphasis added.]
On May 7, 2004, a competency hearing was held. Dr. Gooriah testified and his report was entered in evidence. The judge did not address defendant and made no inquiry of him regarding his understanding of the proceedings against him and the factors specifically enumerated in N.J.S.A. 2C:4-4. At the commencement of the hearing, the judge read the conclusions in Dr. Gooriah's report, and then said:
We brought the doctor up because, as I said to the doctor when he was here on another matter, Ann Klein is our independent *79 expert. I have to rely on them being able to come to a conclusion whether or not [defendant] is competent or not competent.
If he's not competent, I don't want him to stand trial. Okay. If he is competent, he should stand trial. I'm not qualified to determine his competency. I'm competent to listen to a doctor but, that's why we had the doctor come up.
Throughout his testimony, Dr. Gooriah adhered to his position that he could not determine within a reasonable degree of medical certainty whether or not defendant was competent to stand trial. He pointed, however, to a number of factors upon which he could base an "educated guess," that defendant was fit to stand trial. He noted that defendant was functioning well in the unit and in rehabilitation and interacting appropriately. He pointed to the nature of the "status offense" in which defendant exhibited "stalking predatory behavior" and took the victim "to a higher landing where he could not be seen and performing the alleged act," after which he "very cooly, composedly walked out of the building" and ran away when he knew he was being followed.
These circumstances, together with defendant's statement that neither he nor anyone in his family had any history of mental illness, the fact that he attended regular classes in school, and then dropped out to obtain vocational training, demonstrated high functioning and ability to understand, comprehend, plan, sequence, organize and execute "any act that he has to do." Dr. Gooriah summarized that this "shows that his cognitive functioning is quite high and certainly it would point to the possibility of being competent to stand trial." (Emphasis added). He said AKFC staff ruled out "the presence of a mental illness like psychotic disorder, schizophrenia, major depressive disorder." When asked by the court, "Are you saying those don't exist?" Dr. Gooriah responded, "No, your Honor. They do not exist. We have not seen any evidence of any mood disorder nor any psychotic disorder." This statement conflicted with his report, which set forth a diagnosis of psychotic disorder, not otherwise specified.
Dr. Gooriah further noted that if defendant's guardedness was attributable to paranoia, the anti-psychotic medications he was given at AKFC would have been expected to cause a change in this behavior, but there was no change. This was a further indication in Dr. Gooriah's view that defendant's refusal to cooperate was deliberate. Dr. Gooriah also found it significant that defendant "keeps himself very well. His activities of daily living skills were excellent."
Defense counsel questioned Dr. Gooriah and confirmed that he was unable to determine whether defendant understood the role of a prosecutor, defense counsel, and the like, and then asked: "But, in fact, since you can't even get him to answer any questions, it's probabl[e] you could guess that he is unable to participate in an adequate presentation of his defense; correct?" Dr. Gooriah responded, "Yes." The court then inquired whether Dr. Gooriah's educated guess was that the witness was not competent to stand trial, to which Dr. Gooriah replied, "No. If I were to make an educated guess, your Honor, in view of what I have mentioned earlier, I would make an educated guess that he is competent to stand trial and that he is malingering mental illness." The judge pressed further: "If he doesn't understand all of those things, then clearly [he is] not competent to stand trial." Dr. Gooriah responded, "That is not correct, your Honor. He refuses to cooperate."
Defense counsel reiterated his earlier line of questioning, establishing again that *80 Dr. Gooriah could not render an opinion to a reasonable degree of medical certainty, and asking whether Dr. Gooriah's earlier answer that defendant "could not participate in an adequate presentation of his defense" was also an educated guess, to which Dr. Gooriah answered, "Yes."
This exchange then followed between the court and Dr. Gooriah:
THE COURT: If your educated guess is he could not adequately participate in his defense, I don't understand how your other educated guess is that he's competent to stand trial, if he's not able to participate in his defense which is necessary?
A. Your Honor, this patient refuses to cooperate. Yet his behavior and what we have noted of his behavior, his ability to show high executive functioning, show that this is a person who is simply refusing to cooperate with the testing.
In fact, I asked the psychologist to find out if there is some mental illness there. There again, the moment we tell him what his charge is, especially the sexual part of the charge, he just shuts off completely and refuses to participate.
But, you know, when we look at this person's, you know, behavior, his abilities to give a good chronology of his life events when he chooses to cooperate and his statements that these charges will be dismissed and they will have to let me go, he didn't want to participate.
He said: Just send me back to jail. They will have to let me go. This has happened before.
THE COURT: I understand everything that you're saying. What I don't understand is the one part, in response to [defense counsel's], I thought, clear question as to whether or not he could cooperate if he chose to?
Dr. Gooriah expressed the view that defendant, by deliberate plan, was refusing to cooperate with the interview process, believing that he would be sent back to the jail and the charges against him would have to be dismissed. This plan, in Dr. Gooriah's view, was a rational one.
The judge acknowledged that the issue before him presented "a very difficult question." He then rendered his decision, making these findings:
It comes down to the court's determination. This, not being the normal situation where I would have a report to say to a degree of medical certainty this: He's competent or he's not competent. Sufferingsuffers from a mental disease; he doesn't suffer.
He can't do that and the reason he says he can't do that is because he can't complete all the tests necessary to come to a scientific certainty or a medical certainty. And, that's because [defendant] refuses to do the tests.
That forces looking at things other than the tests that he can't do. And, so the doctor talked about making observations of him on a daily basis done by the medical staff. And, that his daily living skills were excellent.
He talks about that in his belief he doesn't suffer from mentala mental illness. There having been no mental illness in his family. That he was never institutionalized. He went to regular school. He finds that he's high functioning, in that he can do anything he chooses and plans to do as opposed to anything he's told to do. That he's performing well in his daily activities.
The ultimate conclusion that he comes to is that if he chooses to, he could cooperate with counsel but, at this point, he's not choosing to cooperate with counsel. Like he was not choosing to cooperate with the doctor.

*81 Based upon the doctor's testimony, I find him competentnot easy-but competent.
After the May 7, 2004 competency hearing, another six months elapsed before trial began in late November 2004. During that time, at various pretrial proceedings, defense counsel continued to inform the court that, in his view, defendant was not competent to understand the proceedings or assist in his defense. We further note that on various occasions in pretrial proceedings, the court engaged in extensive colloquy with defendant, urging him to wear civilian clothing at trial, but each time defendant persistently refused. Each time the judge patiently explained the benefit to a defendant on trial of dressing in civilian clothing in front of the jury. Defendant did not demonstrate an understanding of the issue despite the extended explanation given by the judge. Here is a relatively abbreviated excerpt from proceedings on October 13, 2004:
MR. PURNELL: I don't want to put on them clothes, man.
THE COURT: Yeah, but, Mr. Purnell, you don't want the jury to see you in a prison jumpsuit. You want this case decided on the facts. You don't want the case decided because somebody looks at you and says he's in jail. That shouldn't play a role in this case. You want to get a fair trial, as fair as you can get, right?
MR. PURNELL: Yeah, the clothes don't matter to me.
THE COURT: They don't matter to you, and they may not matter to the jury, but why take a chance?
MR. PURNELL: `Cause it don't matter, man. I'm in here, man.
THE COURT: Butbut the jury doesn't have to know that. . . . Okay? You don't want this case possibly decided on something that has nothing to do [with] whether or not you're guilty. You want this to be decided on the facts, not on whether or not you're in jail. I want you to get a fair trial. So does [defense counsel]. You may not believe the prosecutor wants you to get a fair trial, but he does.
And the fairest trial that you can get is if you're wearing something other than the jail jumpsuit. I can't make you do it. I'm not going to have you held down and put clothes on you. I won't do that. I mean if you insist on wearing what you've got, you can insist. I'm telling youand I think [defense counsel] has told youI think it's a mistake for you to do that.
MR. PURNELL: I'm alright, man.
THE COURT: I'm sorry, I didn't hear what you said.
MR. PURNELL: I said I'm alright. I'm alright with what I got on, man. I ain't puttin' that on, man.
THE COURT: Well, tell me now before I tell the warden that he's got to make sure that you're dressed. Will you put those clothes on when they're available?
MR. PURNELL: Yeah.
THE COURT: Well, if you're willing to put those clothes on, why won't you put these clothes on?
MR. PURNELL: `Cause I don't like them. I don't like that style.
THE COURT: Well, I got others. Whatwhat do you like? Tell me and I'll see if I
MR. PURNELL: I'd like to leave, man.
THE COURT: Well, you can't leave. That'sthatI'm talking about clothes, Mr. Purnell. You can leave
MR. PURNELL: I'm alright with

*82 THE COURT:if you're found not guilty.
MR. PURNELL: Yeah.
THE COURT: I mean I've got other clothes I'll offer you.
[DEFENSE COUNSEL]: You want me to bring in some other clothes so you
MR. PURNELL: I don't want you to do nothin' man, but just get this over with, man.
THE COURT: Mr. Purnell, you don't want to just get this over with. You want to go home, right?
MR. PURNELL: Yeah, I've been
THE COURT: You want
MR. PURNELL:here goin' on two years.
THE COURT: Ino, no. No. no. You want to do anything that you can do to help your case, right? . . . You want to be found not guilty.
[DEFENSE COUNSEL]: We have to do it right.
THE COURT: And in order to be found not guilty, you want to take advantage of everything you can do to help your case. I'm talking about for today only. And I've got other clothes I'll offer you if you don't like these. Will you try `em . . . just for today?
[DEFENSE COUNSEL]: In the back I'll talk to you for a minute.
MR. PURNELL: I don't want to try nothin', man.
THE COURT: You take a look at `em, Mr. Purnell?
MR. PURNELL: No, man. I'm okay.
Trial did not commence on October 13, 2004, and, on the day it did begin, November 29, 2004, the clothing issue was again addressed. It was noted at the commencement of the proceedings that defendant was dressed in prison garb. Defense counsel stated, "it's the defense position that the reason he is making this choice that's clearly against his interest is because he's not competent to stand trial."
After the State rested at trial, defense counsel advised the court that defendant would not testify and the defense would rest. The judge addressed defendant and elicited from him his understanding that he had the right not to testify that his attorney explained his options to testify or not, and that he would not testify. The judge asked defense counsel whether he was satisfied that defendant's decision not to testify was voluntary. Counsel qualified his affirmative response "[w]ithout waiving any of the arguments [he] made in the past leading up to this trial."
Prior to sentencing, defendant moved to vacate the verdict on the ground that he was not competent to stand trial. Defendant argued that the judge who conducted the competency hearing erred in finding that the State had carried its burden of proof of competency. He further argued that the determination was stale because of the intervening six months before trial actually occurred, during which defense counsel repeatedly informed the court that defendant was incapable of understanding the proceedings or assisting in his defense.
The judge denied the motion. Primarily, he deferred to the decision by the judge who conducted the competency hearing. He also noted that during the trial he observed that defendant "did not appear to be agitated, he did not show any involuntary hand movements or body movements, he did not mutter to himself or appear to be uninterested in the proceedings that were taking place." The judge also noted that defendant refused to avail himself of civilian clothing, notwithstanding his earlier extended colloquy with him about the benefits of wearing civilian clothing. The *83 judge concluded that defendant's responses about the civilian clothing were "appropriate and knowing, intelligent and [that] he voluntarily waived wearing civilian clothing." The judge acknowledged that it would have been preferable had the first judge at the competency hearing addressed defendant to inquire about the N.J.S.A. 2C:4-4 factors. He also noted that it would have been preferable had he done so as the actual trial time approached. Nevertheless, the judge denied the motion and proceeded to sentence defendant.

III
The test for competency to stand trial arises from basic concepts of due process. A defendant tried or convicted while incompetent to stand trial has been deprived of his or her due process right to a fair trial. Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815, 818 (1966). Where evidence raises a bona fide doubt as to a defendant's competence, a competency hearing must be held. See id. at 385, 86 S.Ct. at 842, 15 L.Ed.2d at 822. Once the issue is raised, the State bears the burden of establishing competence by a preponderance of the evidence. State v. Lambert, 275 N.J.Super. 125, 129, 645 A.2d 1189 (App.Div.1994).
The minimum requirements for determining a defendant's competence to stand trial were expressed by the United States Supreme Court in Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (1960). The Court defined the test as "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him." Ibid.
The test in New Jersey has been codified in the Criminal Code, as follows:
a. No person who lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures.
b. A person shall be considered mentally competent to stand trial on criminal charges if the proofs shall establish:
(1) That the defendant has the mental capacity to appreciate his presence in relation to time, place and things; and
(2) That his elementary mental processes are such that he comprehends:
(a) That he is in a court of justice charged with a criminal offense;
(b) That there is a judge on the bench;
(c) That there is a prosecutor present who will try to convict him of a criminal charge;
(d) That he has a lawyer who will undertake to defend him against that charge;
(e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;
(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and
(g) That he has the ability to participate in an adequate presentation of his defense.
[N.J.S.A. 2C:4-4.]
*84 When the court determines that a bona fide doubt exists as to defendant's fitness to proceed, the court may order examination of the defendant by at least one qualified psychiatrist or licensed psychologist to examine and report upon the defendant's mental condition. N.J.S.A. 2C:4-5a. Of course, either the State or defense may also have the defendant evaluated by a psychiatrist or psychologist of their choice. Ibid. If the examination directed by the court cannot be conducted because of the defendant's unwillingness to participate, "the report shall so state and shall include, if possible, an opinion as to whether such unwillingness of the defendant was the result of mental incompetence." N.J.S.A. 2C:4-5c. In such a case, the court has options, including permitting examination without cooperation and appointing a different psychiatrist or psychologist to conduct an examination. Ibid.
In this case, a judicial determination was made more than a year before trial that a bona fide doubt existed as to defendant's competency. The determination was based upon defense counsel's representations to the court and the court's own observations of defendant resulting from a "quick voir dire." Defense attorneys are in the best position to assess competency issues of their clients, and courts should consider seriously such representations. See State v. Harris, 181 N.J. 391, 458, 859 A.2d 364 (2004), cert. denied, 545 U.S. 1145, 125 S.Ct. 2973, 162 L.Ed. 2d 898 (2005); State v. Spivey, 65 N.J. 21, 37, 319 A.2d 461 (1974). That was done here. Of course, the judge was not bound by counsel's representations, which, even if made in good faith, might be unfounded or unpersuasive. However, in combination with counsel's representations, the judge made his own assessment of defendant and agreed there was a bona fide doubt as to defendant's competency. That determination having been made, the State bore the burden of proving otherwise by a preponderance of the evidence. If the State failed to meet its burden, the bona fide doubt as to defendant's competence continued, and he could not be put on trial.
Further, even if a competency determination is made, the court has a continuing obligation to revisit the issue if warranted by further information as the proceedings progress. Spivey, supra, 65 N.J. at 40, 319 A.2d 461. Here, defense counsel continued to represent to the court his perception that defendant was unfit throughout pretrial proceedings, during the six-month hiatus after the competency hearing, during trial, and in a post-trial motion.
The only evidence at the competency hearing was the report and testimony of Dr. Gooriah. We first note that Dr. Gooriah's opinions, couched in terms of an "educated guess" do not constitute competent expert opinion. See State v. Harvey, 121 N.J. 407, 431, 581 A.2d 483 (1990) (asserting that medical expert testimony must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible.) And, on the ultimate issue of competency, Dr. Gooriah equivocated in the "educated guesses" he offered, at some times saying it was his educated guess that defendant could not assist in his defense, while at other times expressing his educated guess that defendant could assist if he chose to do so. We note other significant inconsistencies in Dr. Gooriah's testimony and report. His report, for example, contains a diagnosis of psychotic disorder, not otherwise specified. In his testimony, he denied the existence of such a condition in defendant.
Dr. Gooriah also presented factual testimony. For example, he related the history *85 given by defendant, including defendant's denial of prior mental health issues for him or his family, that defendant did well in rehabilitation and interacted appropriately, and that he performed well in his daily living activities. Of course, Dr. Gooriah knew all of this information when he concluded in his report and reiterated in his testimony that he could not determine whether defendant was competent to stand trial. The judge relied upon these circumstances in reaching the conclusion that defendant "could cooperate with counsel but, at this point, he's not choosing to cooperate with counsel." This was basically a restatement of Dr. Gooriah's educated guess (which, in turn, was contrary to other educated guesses expressed by Dr. Gooriah), and, in our view, the conclusion is not adequately supported by sufficient credible evidence in the record.
We are mindful of the substantial deference to which trial judges are entitled in making these determinations. State v. M.J.K., 369 N.J.Super. 532, 548, 849 A.2d 1105 (App.Div.2004). Nevertheless, a determination of competency cannot be sustained in the absence of sufficient supporting evidence. It is natural and appropriate for a judge to view with skepticism a defendant's claim of incompetence where the defendant does not cooperate in a competency evaluation. But the lack of cooperation may well be a product of mental incompetence. See N.J.S.A. 2C:4-5. A refusal to cooperate must be adequately explained and reconciled with an ultimate finding of competence. That was not done here.
We are also influenced by the failure of either judge during the course of these proceedings to make an effort to inquire of defendant, after instructing him in the same manner that prospective jurors are instructed about trial procedures, about his understanding of the N.J.S.A. 2C:4-4 factors. See State v. Moya, 329 N.J.Super. 499, 748 A.2d 604 (App.Div. 2000). We realize that Dr. Gooriah reported that when he made those inquiries of defendant, he was unable to make a determination. Nevertheless, as part of the competency evaluation, the judge should make the effort on the record to evaluate defendant's understanding of those issues.
Other evidence, not addressed by the trial judge or adequately explained, influences our determination of insufficient evidence. Defendant persisted in his belief that the charges against him involved nothing more than CDS and, based on his prior experiences with such charges (which according to defense counsel were minor cannabis charges), defendant believed he was not facing any serious consequences in this case. Defendant's persistence in refusing to wear civilian clothing, while not unheard of in criminal cases, is particularly troubling here in light of the repeated efforts by two judges and defense counsel to persuade defendant it would be in his best interests to wear civilian clothing. The portion of the extended colloquy we have quoted illustrates a complete lack of understanding by defendant of the significance, in the eyes of the jury, of his clothing. The second judge's finding that defendant's responses were "appropriate and knowing, [and] intelligent" and that defendant "voluntarily waived wearing civilian clothing" is not supported by the record. Defendant's persistent request while confined at AKFC that he be returned to the jail so they would let him go, while he was facing a potential thirty-year sentence with strong evidence against him, seems to us at least as indicative of irrational thought as a deliberate plan to avoid consequences by not cooperating.
At the sentencing proceeding, defense counsel represented that on the day a plea cut-off was to be imposed, defendant's *86 family members came to court and, together with defense counsel, tried to persuade defendant to accept a favorable plea offer in light of the strong evidence against him and the seriousness of the offenses, but counsel expressed his "belief that the reason that [defendant] wouldn't consider that is because of his mental status." We also note defendant's allocution at sentencing. Again, while denial of guilt is not unprecedented after a jury verdict, defendant's manner of expression is cause for concern about his understanding of the proceedings:
THE DEFENDANT: Yeah. I ain't do none of that stuff they talking about. Whatever they talking about, got nothing to do with me, that kidnapping, put the knife on him, I didn't do none of that shit.
. . . .
THE DEFENDANT: The way I feel. You all talking about this life style and all this, I ain't do nothing, work, being in jail this long around the people I never been around in my whole life and I don't come to jail like that.
I do not go to jail, back and forth or just be out there robbing, grabbing people and stuff like that. That ain't my type of life. I don't do that, and I hate it. Man, I hate coming in here. I hate being around the people I'm in with and I don't want to go no where else around people like that `cause I never been around people like that in my life.
I just don't like it, coming in here, just sitting and listening to everybody talk all this stuff when all you got to do is just let me go, get the real people behind the stuff doing this shit. It is not me, man.
At the competency hearing, the judge acknowledged his need for expert assistance in making the competency determination. Of course, the ultimate determination of the issue is for the judge to make, not experts. M.J.K., supra, 369 N.J.Super. at 548, 849 A.2d 1105. Nevertheless, the judge relied heavily upon Dr. Gooriah's educated guess that was favorable to a finding of competence.
In light of Dr. Gooriah's inconclusive report (even before his testimony at the competency hearing), the court or the prosecutor could have sought further expert evaluation of defendant. They could have also done so after the competency hearing, which could have been continued without decision pending the development of further evidence. A more in-depth analysis could have been made. For example, defendant's school records and institutional records from his prior incarcerations could have been obtained for evaluation by the court and mental health experts. The decision did not have to be made based on the very thin evidence presented at the competency hearing. The court could well have ordered further investigation into this critical issue. And, in this regard, we place little stock in Dr. Gooriah's negative response to the judge's question of whether anyone at AKFC would be able to conclude whether or not defendant was competent to stand trial "assuming his behavior stays the same and he refuses to cooperate." Dr. Gooriah was not qualified to say what others could or could not do. And, perhaps with different techniques and approaches, other mental health professionals might obtain a greater degree of cooperation from defendant. Even without more cooperation, other evaluators might be able to reach a conclusion to a reasonable degree of medical certainty that defendant was or was not competent.
In light of our conclusion that the State failed to carry its burden of proof that defendant was competent to stand trial, we are constrained to reverse defendant's conviction *87 and remand for a new trial if, after an appropriate inquiry into defendant's fitness to proceed, it is determined that he is competent to stand trial.

IV
In the event of a retrial, we comment briefly on the aspect of the kidnapping charge dealing with "unlawful confinement" of the victim. Defendant was charged with kidnapping under N.J.S.A. 2C:13-1b(1), which provides in relevant part:
A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, for a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:
(1) To facilitate commission of any crime or flight thereafter[.]
At the end of the State's case, the defense moved for acquittal on the kidnapping count, arguing that viewing the evidence in the light most favorable to the State, see State v. Reyes, 50 N.J. 454, 459, 236 A.2d 385 (1967), the jury could find neither that defendant removed S.S. a substantial distance nor for a substantial period. Alternatively, the defense argued that at the very least, the evidence was insufficient to support the substantial period alternative, and that alternative should not be submitted to the jury. The judge denied the primary and alternative motions.
On appeal, defendant concedes that there was sufficient evidence to submit the substantial distance alternative to the jury. We agree. The removal of S.S. up an additional flight of stairs was not merely incidental to the underlying sexual crimes but exposed her to an increased risk of harm. See State v. Masino, 94 N.J. 436, 445-47, 466 A.2d 955 (1983); State v. Matarama, 306 N.J.Super. 6, 22, 703 A.2d 278 (App.Div.1997), certif. denied, 153 N.J. 50, 707 A.2d 154 (1998).
Defendant argues, however, that the substantial period of confinement alternative should not have been submitted to the jury, and because the jury was instructed that either alternative would satisfy an element of the kidnapping offense, defendant's conviction of the kidnapping count (and the derivative count of aggravated sexual assault committed during a kidnapping) must be reversed. We agree with defendant.
A substantial period of time is not defined in seconds or minutes. Instead,
one is confined for a substantial period if that confinement "is criminally significant in the sense of being more than merely incidental to the underlying crime," and that determination is made with reference not only to the duration of the confinement, but also to the "enhanced risk of harm resulting from the [confinement] and isolation of the victim [or others]. That enhanced risk must not be trivial."
[State v. LaFrance, 117 N.J. 583, 594, 569 A.2d 1308 (1990) (quoting Masino, supra, 94 N.J. at 447, 466 A.2d 955).]
During the time the sexual assaults were occurring, there was no confinement that was not incidental to the underlying criminal conduct. Then, defendant spoke to S.S. for about one minute, asking her not to cry and directing her to remain there until he left the building. He then descended the stairs and left the building, which took about thirty seconds. During that thirty second interval, S.S. was not bound or locked in the landing area. The State argues that S.S. was psychologically confined during that thirty second period because she knew defendant had a knife and she was in fear for her safety if she *88 left the landing before he left the building. The State further argues that during this period of confinement S.S.'s risk of harm was enhanced because she could have gone on the roof in an effort to get away from defendant and could have fallen, or, she could have left prematurely going down the stairs and been subject to further harm from defendant.
We reject these arguments. It is very doubtful that the thirty second period can be properly characterized as confinement under these circumstances. Even if it could be so characterized, we fail to see how S.S.'s risk of harm was enhanced during that period. She could not go on the roof because the access door was locked. Defendant ran down the stairs without interruption and exited the building. With each step he took, S.S.'s risk of harm was diminishing, not increasing. Finally, even if S.S.'s brief stay on the fourth floor landing somehow increased her risk of harm, that increased risk was not more than trivial. The safety of her apartment was only one flight down, to which she proceeded as soon as defendant left the building.

V
Defendant's conviction is reversed, and the matter is remanded for a new trial if, after an appropriate inquiry into defendant's fitness for trial, it is determined that he is competent to stand trial.