# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5526-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RICHARD R. LEONCINI,

    Defendant-Appellant.

_____

Argued February 6, 2017 — Decided  March 1, 2017

Before Judges Sabatino and Nugent.

On appeal from Superior Court of New Jersey,
Law Division, Burlington County, Indictment
No. 14-07-0697.

Jaime B. Herrera, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender, attorney;
Ms. Herrera, of counsel and on the briefs).

Jennifer B. Paszkiewicz, Assistant
Prosecutor, argued the cause for respondent
(Robert D. Bernardi, Burlington County
Prosecutor, attorney; Ms. Paszkiewicz, of
counsel and on the briefs).

PER CURIAM

    Tried by a jury, defendant Richard R. Leoncini was found

guilty of second-degree eluding, N.J.S.A. 2C:29-2(b).  The trial

judge downgraded the conviction to a third-degree offense at sentencing and imposed a three-year flat custodial sentence.

On appeal, defendant raises two arguments in his brief:

POINT I

DEFENDANT WAS DEPRIVED OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL BECAUSE DESPITE EVIDENCE THAT HIS MENTAL STATE HAD DECLINED SINCE THE OUTSET OF THE TRIAL, THE TRIAL COURT FAILED TO REEVALUATE DEFENDANT'S COMPETENCE.

POINT II

THE TRIAL COURT ERRED IN IMPOSING A PRISON SENTENCE WHERE DEFENDANT'S EXTENSIVE HISTORY OF MENTAL ILLNESS, HIS SUICIDAL TENDENCIES, AND HIS MEDICAL ISSUES OUTWEIGHED THE NEED FOR GENERAL DETERRENCE.

Having considered these arguments in light of the record and the applicable legal principles, we affirm.

I.

The factual scenario arises out of defendant's operation of his vehicle on February 1, 2014, and his related conduct on that day. The proofs at trial revealed the following sequence of events.

The Driving Episode

On the day in question, Mansfield Township Police Detective Daniel Ehnstrom was on duty around 6:30 p.m. when he witnessed a

white Chevrolet HHR make an illegal U-turn on Route 206. The detective, who was driving a marked patrol car in the opposite direction, turned around to pursue the Chevrolet. He activated the police car's emergency lights. Within "a few seconds," the detective caught up to the Chevrolet, but it continued going at the same speed.

The detective kept following the Chevrolet as it drove along the state highway. Attempting to catch the pursued driver's attention, Ehnstrom sounded his air horn and police siren, but the driver did not stop. Throughout the encounter, the driver essentially maintained the same speed.

As the detective's pursuit continued, the Chevrolet driver turned onto Route 68, a four-lane highway. Once on that highway, the driver began to swerve between lanes. He stuck his left hand out the window to wave at the police car, which Ehnstrom perceived as "an effort for me to pull up next to him." The driver approached the intersection at Nade Drive, and then, according to Ehnstrom, ran the red light without slowing down. At the next red light at Mansfield Road East, Ehnstrom testified, the driver "slowed down a little bit," but still ran the red light. Further along, at the intersection with Route 537, the driver "appeared to hit the brakes and slow up," but did not stop at the red light.

Ehnstrom testified that the driver wore camouflaged clothing and was heading in the direction of Fort Dix. Route 68 ultimately dead-ends into the entrance of that military base. The detective radioed dispatch "to notify the Department of Defense and the military personnel that we were headed in their direction in case there may be some sort of terrorist or some other concern."

Further down Route 68, the road narrowed into two lanes, one in each direction. The Chevrolet and the police car then came upon two other cars, which were stopped at a red light at the Saylors Pond Road intersection. To get around those cars, the Chevrolet driver veered into the lane of oncoming traffic, again running a red light.

When the Chevrolet and the police car approached Fort Dix security checkpoint, the Chevrolet driver stopped his car and got out. Detective Ehnstrom observed that the driver was a "white male, probably approximately in his 50s, wearing a camouflage [basic military uniform], [and] kind of disheveled looking." The detective later identified the driver as defendant.

Detective Ehnstrom got out of his police car and approached defendant. He testified that defendant "complied and was handcuffed and was taken into custody." Defendant gave the detective his real name and did not try to mislead him.

A-5526-14T1

Fort Dix personnel apparently were in possession of defendant's driver's license, based on a previous interaction with him at the base earlier that day. According to Ehnstrom, "probably ten or twelve" security officers were stationed at the gate, instead of the usual two officers. The base employees had also constructed a temporary barricade.

Defendant's Account

Defendant presented a somewhat different narrative during his own trial testimony. According to his account, on February 1, 2014, after watching a television show about American soldiers being wounded overseas, he "drove down to Fort Dix and . . . started asking . . . questions." Defendant asserted that he was concerned about how the military "reinforce[s] the Humvees or why are all of our service personnel coming back with so many injuries."

Defendant acknowledged that he drove to Fort Dix wearing camouflage. Upon arrival, he asked an officer at the security booth several questions relating to his concerns about wounded service personnel. The security officer requested and obtained defendant's identification, which the officer kept. The officer told defendant he could not leave. According to defendant, this interaction made him nervous, so he got into his Chevrolet and left the base without his identification.

Defendant drove away from Fort Dix onto Route 68 and turned onto Route 206.  At that point, he realized he should not be driving without his license.  According to defendant, he called either 4-1-1 or 9-1-1, and asked for a State Police dispatcher.  He claimed that he asked for "backup" from the State Police to accompany him, "because [he] didn't know if [he] went back [to Fort Dix] what they were going to do."

While still on the phone, defendant turned his Chevrolet around by making a U-turn on Route 206.  He claimed that he did not see a sign indicating such a U-turn was improper.  At that point, he dropped his cell phone onto the car floor.  He leaned over to try and pick it up.  When he looked up again, defendant noticed what he believed was the State Police "backup" that he had requested, driving behind him.  According to defendant, he did not want to pull over because he did not possess his identification.

Defendant continued driving toward Fort Dix.  He testified that he waved at the police vehicle following him "two or three" times.  Although he acknowledged driving through several red lights, defendant explained, "I was driving real slow.  The officer that was behind me kept his distance.  He wasn't driving aggressive.   I wasn't driving aggressively."  Defendant acknowledged that once he arrived at Fort Dix, he was arrested.

6

Defendant explained at trial why he thought the police had followed him, and why he did not stop:

> To stop me. I'm telling you he [the officer] had his lights on. He wanted to stop me. I wanted to get back to Fort Dix and make as big of a scene as possible so Fort Dix knew and the [S]tate [P]olice were there that they knew they were protected and there were people protecting them. I wasn't trying to harm anybody. I wasn't driving erratically. I slowed down and made sure all vehicles were clear of my path. I knew with the police officer's lights on behind me with his siren going that any vehicles in any intersections would slow down because there was an emergency vehicle approaching.
>
> [(Emphasis added).]

The Pretrial Proceedings

Following this incident, defendant was charged with second-degree eluding. Defendant did not challenge through his counsel the legality of the motor vehicle stop. Instead, the pretrial proceedings focused on defendant's competency to stand trial.

At defendant's first court appearance on February 3, 2014, the judge attempted to set bail, but defendant insisted on discussing the merits of the case. The bail decision was consequently delayed to the following day.

The next day, the judge again attempted to ask defendant if he understood the charges. After hearing some ramblings by defendant about inmates at Guantanamo Bay, the judge set bail.

7

The judge also required defendant to be held, pending a court-ordered psychiatric evaluation.

The record on appeal does not include a copy of the initial psychiatric evaluation. However, later reports indicate that defendant underwent that initial court-ordered screening on February 14, 2014.

Based upon observations that he was "confused, agitated, and disorganized," defendant was civilly committed temporarily to a hospital for psychiatric treatment. During that brief commitment, defendant was medicated with Depakote and Haldol, and his condition improved. At some point not specified in the record, medical personnel deemed defendant suitable for discharge, and he was released from the hospital on February 24, 2014. Because his bail had been posted, he was released into the community. He lived at home until the time of trial.

In September 2014, the trial court conducted a status hearing to address the State's plea offer and also to discuss defense counsel's motion for a competency hearing. With respect to the second-degree eluding offense, which exposed defendant to a five-to-ten-year custodial sentence, the State offered him a noncustodial sentence within the third-degree range, with a mandatory six-month loss of driver's license. Defense counsel

advised the court that he had discussed the State's offer with defendant "many, many times," and that the client had rejected it.

Defense counsel requested the court to order a second competency evaluation to supplement the results of the February 2014 evaluation. Counsel argued that the initial evaluation was not a "full blown competency evaluation," since it did not explicitly confirm that defendant understood the judge's role in the trial and his own role as an attorney. Without objection from the State, the court ordered the second evaluation.

### Dr. Paul's Competency Evaluation

The second evaluation was performed by a licensed psychologist, Dr. Peter D. Paul, who was with defendant for an hour on October 7, 2014. Dr. Paul issued his written report of that session on October 31, 2014. As part of the evaluation, Dr. Paul reviewed defendant's medical and criminal records.

Defendant disclosed to Dr. Paul that he had a history of mental illness. That history stemmed from a childhood accident in which he was "hit by a bus while riding a motorcycle, causing him to crash head first into a telephone pole."

Dr. Paul noted in his report that defendant showed he was aware that the court had ordered him to be evaluated, and that he understood that the evaluation could not be used as evidence against him in the criminal case itself but only to determine his

competency. The doctor stated that defendant was "extremely verbal and tended to go off on tangents, but was generally cooperative with being interviewed[.]" Defendant disclosed to Dr. Paul the medication that he was taking. He denied experiencing any hallucinations. Dr. Paul specifically noted in this regard that defendant "did not display a disturbance in his thinking."

Dr. Paul found defendant "initially irritable," but noted that as the interview progressed, he complied with questions. Dr. Paul found that defendant's "mood appeared to be relatively stable." With respect to defendant's cognitive skills, Dr. Paul observed that his thinking was "logical and clear," and that he could easily recall recent as well as more distant memories. Although defendant was prone to go off on tangents, Dr. Paul nonetheless found he was "fully alert."

On the subject of his pending criminal case, defendant told Dr. Paul that he had not accepted the State's plea offer because "he would be set up to fail [probation]" inasmuch as he would not be able to get to the Probation Office in New Brunswick by mass transit. Defendant did admit to Dr. Paul that he "got a little upset in court" when his attorney had encouraged him to accept the plea offer.

Additionally, Dr. Paul found that defendant recognized the elements of the criminal justice system, and how those elements

related to him and his case.  The doctor noted that defendant knew that he was charged with a crime arising from his failure "to yield to a police vehicle."  Defendant also displayed to Dr. Paul an understanding of the respective roles of the prosecutor, the judge, his attorney, and the jury.  Defendant recognized that he had the right to remain silent at trial or testify on his own behalf.

In sum, Dr. Paul concluded that defendant was competent to stand trial.  The doctor recommended that defendant continue with his medication to maintain that competency.  Dr. Paul noted that defendant was living independently in the community while on medication, and opined that "it is likely that [defendant] will remain competent while he takes his current medication."

As Dr. Paul concluded, "[a]lthough he can be irritable and oppositional, this defendant is living in the community independently at this time.  His current mental condition is such that he does not present a danger to himself, other persons, or property."

The February 25, 2015 Competency Hearing

On the eve of trial, the trial court conducted a competency hearing on February 25, 2015, nearly five months after the October 2014 competency evaluation performed by Dr. Paul.  At the outset of that hearing, the judge noted that he had reviewed Dr. Paul's

report. The judge indicated that he also wanted to hear from defense counsel and defendant himself, in order to "assure the [c]ourt that [defendant] is still competent to stand trial."

Defendant's trial counsel addressed the court first. He stated that he had numerous phone calls and in-person encounters with defendant since September 2014. Counsel stated that his "impression all along [is] that [defendant] has been competent to deal with this matter in the sense that he's always been lucid." The attorney confirmed that defendant understood the charges, as well as the respective roles of the judge, the prosecutor, and the defense attorney, and also his status in the case as the defendant.

Although counsel acknowledged that "because of [defendant's] emotional issues that [he] often times gets off point," the attorney advised the court that "I haven't had problems" bringing his client's attention back to the trial. The attorney maintained that he had been able to discuss the nuances of the case with defendant, as well as the reasoning that had led to his rejection of the plea offer.

The judge next conducted a colloquy on the record with defendant. During this exchange, defendant frequently would veer off-topic or discuss elements of this case, despite his attorney's instructions to remain quiet. However, when he was focused back on the pertinent topics by the judge, defendant generally provided

12

coherent responses that reflected a cogent understanding of the legal process.

Defendant confirmed to the judge his awareness of the roles of the judge, the prosecutor, and his defense counsel. He recognized that the prosecutor was "going to argue to the jury" that he ran two red lights while a police officer was behind him. Defendant also understood that his attorney was "going to be trying to defend me," although he realistically appreciated that counsel's task would be difficult because there was "videotape showing me running two lights, although I was proceeding slowly." Defendant further acknowledged to the judge that he knew he had a right not to testify, although he would "rather explain to the jury what I did [and] why I did it."

Based on these presentations, the judge ruled that defendant remained competent to stand trial. The case then proceeded with the State's evidence.

The Course of the Trial

At several points in the trial, the judge engaged in further colloquy with defendant concerning his decision about testifying. The judge advised defendant to listen to his attorney and evaluate his decision on the subject carefully. The judge read defendant the instruction that would be read to the jury if he opted to testify. The judge further explained to defendant that his prior

13                                                                    A-5526-14T1

convictions could be considered by the jury if he chose to testify. Defendant asked the judge if he could explain those prior convictions if they were admitted. During the course of the colloquy outside of the jury's presence, defendant made various statements to the court that were self-inculpatory.

The judge considered the admissibility of defendant's prior convictions under N.J.R.E. 609 and the Sands/Brunson test.[1] Before rendering his decision on admissibility, the court adjourned for the weekend.

When the case resumed on March 3, 2015, the judge again addressed defendant's intentions about testifying. Defense counsel informed the court that he and defendant had met on the preceding Friday and Saturday to discuss the decision.

> THE COURT: [Defendant], have you made a decision about whether you will testify at trial?
>
> DEFENDANT: I'll let my attorney ask me the questions and I will testify but the verdict is going to be based on the evidence which is not the accurate --
>
> DEFENSE COUNSEL: [Defendant], just answer the question.

---

[1] The Sands/Brunson test evaluates the "remoteness" of a defendant's prior convictions and determines their admissibility at trial. See State v. Brunson, 132 N.J. 377 (1993); State v. Sands, 76 N.J. 127 (1978). But see the revised version of N.J.R.E. 609. (effective July 1, 2014). The admissibility of defendant's prior convictions to impeach his trial testimony is not an issue in this appeal.

DEFENDANT: Yes, Your Honor, I'll testify.

THE COURT: All right. Did you make this decision yourself?

DEFENDANT: Well, my attorney's advising me to make this decision, Your Honor.

THE COURT: Have you been put under any pressure, made any promises or threatened into testifying?

DEFENDANT: No. I was [not] threatened or I haven't threatened anybody else. I just see the way the case has been.

THE COURT: Well, the case isn't over yet. Has your attorney answered all the questions you may have had about this?

DEFENDANT: I suppose.

Defendant ultimately testified, providing his account of the events as we have previously described. At no point during the trial did defense counsel raise defendant's competency as an issue to be considered again by the court.

The Verdict and Sentencing

Following deliberations, the jury found defendant guilty of second-degree eluding, the sole count in the indictment. Defense counsel moved for a new trial, arguing that the court had improperly admitted evidence of defendant's prior convictions. That post-trial motion made no mention of defendant's competency. The court denied the motion, leaving the jury verdict intact.

At sentencing, the judge reviewed a presentence report that provided details of defendant's mental health history. In addition to that past history, the report indicated that defendant had recently experienced suicidal thoughts since the time of the jury's guilty verdict.

The judge noted in his sentencing analysis that he had considered defendant's childhood head injury. The judge also considered defendant's later diagnoses of schizophrenia, bipolar paranoia, and delusion.

The judge identified three applicable aggravating factors that bore upon the sentence: (3) "the risk that defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), (6) "the extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted," N.J.S.A. 2C:44-1(a)(6), and (9) "the need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9). Additionally, the judge found three pertinent mitigating factors: (2) "the defendant did not contemplate that his conduct would cause or threaten serious harm," N.J.S.A. 2C:44-1(b)(2), (4) "there were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense," 2C:44-1(b)(4), and (7) "the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial

period of time before the commission of the present offense," N.J.S.A. 2C:44-1(b)(7).

On balance, the judge concluded that the "mitigating factors substantially outweigh the aggravating factors and there are compelling reasons to downgrade the defendant's sentence." In this regard, the judge noted that "the punitive effect of imprisonment for this particular defendant is disproportionate to the offense committed because of [his] mental health[.]" Accordingly, the judge downgraded the eluding conviction to a third-degree offense. As we have already noted, the judge sentenced defendant to a three-year flat prison term, with no parole disqualifier. The judge also ordered that defendant receive further mental health treatment.

This appeal ensued. We now discuss, in turn, defendant's points regarding (1) competency and (2) the sentence.

II.

Defendant's primary point on appeal is that the trial court, sua sponte, was obligated to order an updated competency evaluation immediately before or during the trial because of his display of aberrational behavior in the courtroom. He contends that the assertions of his trial attorney at the pretrial competency hearing about his capabilities should be afforded minimal weight because an attorney generally lacks the diagnostic skill of a mental health

17                                                    A-5526-14T1

professional. He further contends that Dr. Paul's report had essentially become stale by the time of trial. He maintains that the psychologist's expert opinion vouching for defendant's competency was predicated on an unsupported assumption that defendant would continue to take his medications. He contends that the aberrational behavior he displayed in the courtroom should have raised a serious concern that he was no longer on those medications when the trial proceeded.

Several fundamental principles guide our analysis of this issue. The Legislature has codified the common law standards for mental competence in N.J.S.A. 2C:4-4. The statute prohibits a person "who lacks capacity to understand the proceedings against him or to assist in his own defense" from being "tried, convicted or sentenced for the commission of an offense so long as such incapacity endures." N.J.S.A. 2C:4-4(a). The statute further requires the defendant to be the "mentally competent to stand trial on criminal charges." N.J.S.A. 2C:4-4(b)(1). To determine whether a defendant has the requisite mental competency, it must be shown that he comprehends:

> (a) That he is in a court of justice charged with a criminal offense;
>
> (b) That there is a judge on the bench;
>
> (c) That there is a prosecutor present who will try to convict him of a criminal charge;

(d)   That he has a lawyer who will undertake to defend him against that charge;

(e)   That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;

(f)   That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and

(g)   That he has the ability to participate in an adequate presentation of his defense.

[N.J.S.A. 2C:4-4(b)(2)(a)-(g)].

Last year, our Supreme Court canvassed the procedural aspects that relate to such competency determinations in State v. Gorthy, 226 N.J. 516, 530 (2016).  The Court noted in Gorthy that, when deciding if a criminal defendant is competent, a trial judge retains the authority to decide whether or not to hold a competency hearing, as there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed."  Ibid. (quoting Drope v. Missouri, 420 U.S. 162, 180, 95 S. Ct. 896, 908, 43 L. Ed. 2d 103, 118 (1975)).

19

When a competency hearing is conducted, the State has the burden to prove by a preponderance of evidence that the defendant's mental condition "does not render him or her incompetent to stand trial."  Ibid.  The trial court generally should rely on evaluations by one or more mental health professionals, who opine on the defendant's condition and ability to "understand and participate in the legal process." Id. at 530-31.  The State does not have to prove that the defendant "is capable of formulating a legal strategy" or has the ability to "communicate with counsel using complex language." Id. at 531.  The focus instead turns on the extent the defendant's mental condition "precludes meaningful interaction with his or her attorney." Id. at 532.

A court must make a competency determination based upon sufficient supporting evidence.  Defendant's arguments substantially rely in this regard upon our opinion in State v. Purnell, 394 N.J. Super. 28, 50 (App. Div. 2007).  In Purnell, a defendant challenged his conviction based on incompetency, asserting that the trial judge had improperly rejected his trial counsel's repeated assertions throughout the proceedings that his client was not competent to stand trial. Id. at 49. The defendant noted on appeal that he had not understood the significant jail time he faced, despite his family members strongly encouraging him to accept a plea offer. Id. at 51.  He also referred to various

rambling incoherent responses he had provided to questions from the trial court. Id. at 52.

One year before the trial in Purnell, the court had ordered a competency evaluation of defendant by a clinical psychiatrist. However, the defendant had refused to cooperate during that evaluation. Id. at 38-39. Hence, the psychiatrist could only offer an "educated guess" as to the defendant's competency, which the court found was "inconsistent" about whether he could stand trial. Id. at 49.

Based on the expert report, defense counsel's representations to the court, and a brief voir dire of defendant conducted in court, the trial judge concluded defendant was competent to proceed. Ibid.

On appeal, we overturned Purnell's conviction, finding that the State had failed to meet its evidential burden of competency. Id. at 50. We acknowledged that the defendant's refusal to cooperate hindered a meaningful review of his competence, but without sufficient evidence the court could not find him competent. Id. at 52. We indicated that, in the circumstances presented, the trial court or prosecutor should have procured additional experts to evaluate the defendant. Ibid. We further noted the trial judge could have attempted on the record to question the defendant's understanding of the factors in N.J.S.A. 2C:4-4, or

21

ordered further review of his past medical and school records. Id. at 52-53. Because the State in Purnell did not provide evidence to rebut the bona fide question of the defendant's competency that had been presented, we reversed his conviction. Id. at 53.

Defendant also relies upon State v. Lambert, 275 N.J. Super. 125, 131 (App. Div. 1994). In Lambert, at the outset of trial of the defendant's drug distribution charge, defense counsel requested an adjournment to enable a psychiatric evaluation of his client. Id. at 130. Months earlier, the defendant had told his counsel that he had no history of mental illness. Ibid. However, eight days before trial, defense counsel learned that the defendant in fact took psychiatric medication, had been placed on a suicide watch at prison, and had been diagnosed as a paranoid schizophrenic. Id. at 131.

Despite the fact that the defendant's trial counsel in Lambert informed the court of these developments, and expressed concern about his client's competency to stand trial, the judge denied the request to adjourn the case for a psychiatric evaluation. Ibid. A later psychiatric evaluation at the defendant's pre-sentencing hearing concluded that he was competent. Id. at 132.

On appeal in Lambert, we reversed, finding that because defense counsel had raised a bona fide doubt as to the defendant's

competency, the trial court was required to conduct further inquiry. Id. at 131-32. We noted that the trial attorney was "in a far better position than the trial judge to assay the salient facts concerning the defendant's ability to stand trial." Id. at 131 (quoting State v. Lucas, 30 N.J. 37, 74 (1959)). We also ruled that the later pre-sentencing psychiatric determination of competency did not resolve the issue, because the trial court had too readily dismissed the trial counsel's expressed bona fide concerns about defendant's competency during the trial phase. Lambert, supra, 275 N.J. Super. at 133.

The circumstances here are not comparable to those in Purnell and Lambert. The trial judge responsibly ordered two successive professional evaluations before the trial, the most recent one by Dr. Paul. In addition, the judge engaged in a voir dire of defendant right before the trial began and witnesses were sworn. Moreover, defendant's trial counsel clearly attested to his own positive impressions of his client's competency to stand trial and his ability to assist counsel in the case. This is markedly distinguishable from the situation in Purnell, in which defense counsel repeatedly pressed the competency concerns with the court, which the court ignored.

The present case is also markedly different from Lambert, in that this defendant's mental health history was not hidden until

23

the eve of trial but instead well known and the subject of two pretrial competency evaluations. The judge acted with reasonable diligence and vigilance by ordering two such evaluations, considering their results, and questioning both defendant and his counsel on the record to confirm defendant's ability to proceed. The judge also made multiple inquiries into defendant's decision to testify.

Defendant contends that his display of erratic behavior during the trial phase should have signaled to the court that he was no longer on medication, and therefore the court should have ordered a third competency evaluation. He also points to certain post-trial information to support this argument. In particular, he points to a handwritten letter he wrote to the judge after his conviction and before sentencing, which states that he had been "off [his] medications for a year and a half and was in a very confused, paranoid, and manic state." Defendant also highlights psychiatric reports attached to his sentencing brief indicating he has a "[l]ong history of medication noncompliance at times . . . due to financial problems."

Although we appreciate that an individual's competency can be a dynamic and complicated subject, we are unpersuaded that the trial judge in this case — based on what had been presented to him and what steps he had already taken to assure defendant's

24

competency — had any mandatory obligation to take additional measures. To be sure, the trial transcripts show that defendant often rambled, and his explanation of why he did not stop his car when the police officer signaled for him to do so is not compelling. Even so, defendant ultimately was focused away from tangents. His decision to testify, by all outward manifestations, had been repeatedly discussed with his counsel and the court and he nevertheless exercised his right to present his account to the jury. In Gorthy, supra, 226 N.J. at 536, the Court recognized the importance of providing a defendant with mental health issues with the autonomy to make that choice.

Notably, defendant's trial counsel here endeavored during summations to use defendant's seemingly implausible narrative to his advantage, urging the jurors to take into account that his client "does not have the precise thinking of an accountant, a bookkeeper, [or] a traffic controller." "His mind works differently," counsel argued, defendant "says contradictory things." Counsel advocated that, under the law, a person is not guilty of eluding unless the State proves that the defendant "know[s] that the officer wants to pull over, and that was not the case in this particular instance."

Having thus unsuccessfully attempted to gain an acquittal by such arguments designed to garner the jurors' understanding of his

idiosyncratic manner, defendant is not entitled to a second chance to gain relief through a new argument on appeal about his competency that was never presented to the trial judge by his counsel. We ascribe no nefarious motives to counsel in this regard, as the record, by all indications, reflects that his attorney genuinely perceived defendant to be competent to proceed, as did Dr. Paul and the other expert who had previously examined him.

In a supplemental brief provided to us on our invitation after the appellate oral argument, the assistant deputy public defender has supplied us with citations to several cases in which an appellate court has ordered a remand to the trial court for the purposes of a retrospective competency evaluation. Such a retrospective evaluation could attempt to reconstruct whether a defendant had been competent at the earlier time when he was tried. We discern no reason to compel such a retrospective assessment in this case.

The only reported New Jersey decision cited by the assistant deputy public defender in which such a retrospective evaluation was ordered is State v. Latif, 134 N.J. Super. 441, 447 (App. Div. 1975). That case is not on point here. In Latif, the trial court notably had already granted a new trial because the defendant had been incompetent at the time of his initial conviction. Id. at

444. Before the new trial began, the State's expert opined that the defendant was likely not competent to stand trial whereas the defense expert reached a contradictory finding and opined that he lacked competency. Id. at 444-45. Although defense counsel and the State both agreed to an updated competency hearing, the court declined to conduct one because the defendant had expressed his personal desire to proceed to trial. Id. at 445-46. He then was found guilty by the second jury. Id. at 443.

Given those discrete circumstances, we reversed the conviction in Latif, because the competing expert opinions presented to the trial court required the trial court to conduct further inquiry. Id. at 447. We consequently remanded the case to the trial court to address whether the evidence was sufficient to make a competency evaluation. Ibid.

The situation here is not akin to that in Latif. The only expert evaluations of defendant's competency consistently supported his ability to stand trial, as contrasted with the opposing expert reports that were presented to the court in Latif. Although defendant has been treated in the past for mental illness, there is no indication in this record, unlike in Latif, that he was previously declared incompetent to stand trial. Moreover, defendant's trial counsel here vouched for his client's competency

and did not request an updated hearing. Nor did the prosecutor, as in <u>Latif</u>.

The assistant deputy public defender has intimated that her office has come into possession of additional information that may show that defendant was not, in fact, on his medication as of the time of trial. There was no timely motion to supplement the appellate record with such materials during the briefing of this case. Moreover, even if such medical records do exist and document that defendant was non-compliant with his medications as of the time of trial, no such information was supplied to the court during the trial. We can hardly fault the judge for not considering information that was never provided to him. That said, we do not foreclose defendant from seeking relief in the trial court with alleged newly-discovered evidence in an appropriate motion under <u>Rule</u> 3:20-1, or in a future petition for post-conviction relief under <u>Rule</u> 3:22-1.

Lastly, we reject defendant's argument that his incompetence was demonstrated by self-inculpatory statements he made to the court during trial. He did not make these statements in the jury's presence. We are unpersuaded that the statements required the court to delve further into his competency without a specific request from his counsel in these circumstances.

A-5526-14T1

In sum, we conclude that the trial court had no sua sponte obligation to order an updated competency evaluation in the circumstances presented. The judge acted reasonably and in substantial reliance upon the unrefuted expert reports, the observations and attestations of defendant's trial counsel, and defendant's own insistence on proceeding, in a manner that his attorney attempted to use to strategic advantage with the jurors in summation. The conviction is accordingly affirmed.

### III.

Defendant separately argues that his sentence was excessive. This argument requires little comment. The trial judge reasonably took into account defendant's mental health history in downgrading his second-degree conviction to a third-degree offense for sentencing purposes. We discern no basis to disturb the judge's discretionary weighing of the aggravating and mitigating factors. State v. Roth, 95 N.J. 334 (1984). As the Court instructed in State v. Bieniek, 200 N.J. 601, 612 (2010), when the trial court follows "the sentencing principles set forth in the Code and defined in our case law, its discretion should be immune from second-guessing."

Defendant relies on State v. Jarbath, 114 N.J. 394 (1989) to argue that a sentencing judge should decline to impose a custodial sentence when there is a "serious injustice of imprisonment" in

circumstances that clearly outweigh the need for deterrence.  Id. at 409.  There, the Supreme Court found a custodial sentence improper where the trial court did not downgrade the second-degree manslaughter sentence of a developmentally disabled defendant, despite finding that the aggravating factors were only "marginally applicable."  Id. at 401-02.  Additionally, the Court determined that because the defendant's mental condition rendered her unable to endure prison life and caused her to experience ongoing daily abuse by other inmates prior to sentencing, the "serious injustice of imprisonment" outweighed the importance of general deterrence of the crime.  Id. at 409.

The present circumstances are different.  First, the trial judge here did downgrade defendant's sentence, based on his analysis of the aggravating and mitigating factors, unlike the court in Jarbath, which declined to do so.  Further, although defendant has allegedly experienced sexual abuse while being imprisoned in the past, the record does not contain any evidence of recent ongoing abuse, as was the case in Jarbath.  The judge here reasonably analyzed the aggravating and mitigating factors as applied to this defendant, and found no demonstrated "serious injustice" was present.

In sum, the judge at sentencing fairly took into account defendant's mitigating circumstances, particularly in downgrading

the offense despite the State's arguments for a longer second-degree term.  We decline to "second-guess" the judge's sentencing decision, and the custodial term he imposed.  Bieniek, supra, 200 N.J. at 612.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION