# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5136-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KEVIN C. AMBROSE,

     Defendant-Appellant.

_____

Argued May 20, 2021 – Decided June 7, 2021

Before Judges Yannotti, Haas, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-06-1870.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Emma R. Moore, Assistant Deputy Public Defender, of counsel and on the brief).

Maura M. Sullivan, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Jill S. Mayer, Acting Camden County Prosecutor, attorney; Maura M. Sullivan and Hannah M. Franke, Special Deputy Attorneys General/Acting Assistant Prosecutors, of counsel and on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of murdering his girlfriend Jennifer Bongco and other offenses. He was sentenced to an aggregate eighty-year term of incarceration, with a sixty-three-year, nine-month, period of parole ineligibility. Defendant appeals from the judgment of conviction (JOC) dated April 16, 2018. We affirm defendant's convictions but remand for resentencing.

I.

Defendant was charged under Camden County Indictment No. 15-06-1870 with first degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count one); third degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); fourth degree unlawful possession of a weapon (knife), N.J.S.A. 2C:39-5(d) (count three); and third degree endangering the welfare of a child (J.F.), N.J.S.A. 2C:24-4(a)(2) (count four).[1] In February 2016, defendant's attorney filed a motion to be relieved as counsel. The court heard oral argument and issued an order dated March 21, 2016, granting the motion.

_____

[1] In this opinion, we use initials to identify J.F. since she was found to be a child victim of abuse. See R. 1:38-3(c)(9).

New counsel was assigned to represent defendant, and on April 24, 2017, counsel filed a notice stating that defendant would rely upon a passion-provocation defense at trial. Thereafter, defendant filed a motion for permission to represent himself at trial. The court conducted a hearing and entered an order dated January 3, 2018, dismissing the motion because defendant did not state on the record that he wanted to proceed pro se.

Trial in the matter began on February 6, 2018. At the trial, evidence was presented indicating that in July 2014, defendant and Bongco shared a home in Sicklerville with Bongco's two children from prior relationships, Maria, who was nineteen years old at that time, and J.F., who was five. Between 6:30 and 7:00 p.m. on July 25, 2014, defendant visited the nursing home where Bongco worked as a nurse.

Defendant asked the receptionist if he could speak with "El," meaning Elhouari Achetouane, who worked there as a certified nursing assistant. Achetouane testified that Bongco was his supervisor, and she was his friend, but they were not having a romantic relationship.

He stated, however, that he understood there were rumors that he was having an affair with Bongco, and in the weeks leading up to July 25, defendant had accused him of having an affair with Bongco. Further, on July 24, both

A-5136-17

defendant and Bongco communicated with Achetouane's girlfriend about the rumors, and in those communications, defendant expressed his belief that Achetouane and Bongco were having an affair.

When the receptionist told defendant that Achetouane was not working that night, defendant asked for Bongco. The receptionist then overheard Bongco and defendant arguing for a few minutes, after which Bongco returned to work. Later that night, defendant returned to the nursing home to pick up Bongco at the end of her shift. He brought J.F. with him.

At 12:12 a.m., defendant, Bongco, and J.F. stopped at a Wawa at the corner of Sicklerville and Williamstown Road. They left at 12:20 a.m., with Bongco and J.F. traveling in the back seat of the vehicle. Defendant turned onto Williamstown Road, in the direction of Erial Road.

Shortly thereafter, defendant slashed Bongco with a sharp object while she was in the back seat with J.F. He inflicted at least fifty-two wounds to her face, scalp, neck, back, chest, and upper extremities, but he did not pierce any internal organs. Defendant left Bongco on the side of Erial Road, less than a five-minute drive from the Wawa they had patronized. She bled to death.

A passing motorist noticed Bongco's body and called 9-1-1. The responding officer determined that Bongco was dead. He said that her body was

A-5136-17

"almost like in a fetal position." He stated that she was "on her knees, hands down, face down" with her face on the pavement.

Meanwhile, defendant drove J.F. home. She pounded on the front door. When Maria answered, she found J.F. covered from head-to-toe in blood. J.F. told Maria defendant had killed their mother, and their mother was "on the ground." Maria called 9-1-1, and J.F. told both the 9-1-1 operator and the responding officers that "[t]here was fighting." She said defendant had killed her mother and left her on the ground.

After he left J.F. at home, defendant traveled to Atlantic City, where he gambled at Caesars and checked in as a hotel guest at the Tropicana. At Caesars, a security guard spoke with defendant about his hand, which was bleeding through several paper towels. Defendant told the guard he had injured himself while changing a tire on his vehicle, and he declined an offer of medical assistance.

At 10:00 p.m. on July 25, police arrested defendant in his hotel room at the Tropicana. They found blood on the entry door to the hotel room and on items throughout the room and bathroom, including Bongco's cell phone. Blood samples taken from items in the room were consistent with the DNA profiles of both defendant and Bongco.

5

A-5136-17

The police located defendant's vehicle in the Caesars parking garage. They found blood on the outside of the vehicle and throughout the interior, with the back seat saturated. They also found evidence of slash marks. A blood sample taken from the rear passenger compartment was consistent with Bongco's DNA profile. Blood also was discovered on a woman's purse, which was found in the vehicle's trunk.

After they arrested defendant, the police took him to a hospital for treatment of the cut on his hand. At the hospital, defendant was guarded for about seven hours by Officer John Ervin and Detective Donald Lemons. Both Ervin and Lemons testified that shortly after they arrived at the hospital, defendant spoke to them, without any prompting.

Defendant told them he would take Bongco out to dinner and spend money on her, but it was never enough. Defendant said he and Bongco would have disagreements and she would threaten him with a restraining order. Defendant also said he had suspected Bongco of cheating on him with a man named El because he found a pair of Bongco's red underwear on their bedroom floor, which was soiled with a discharge of some kind. At one point, defendant sat up

6

in his bed and asked the officers "why aren't you guys treating me like a monster for what I did?"[2]

Ahmed Jimmy Mohmod had been incarcerated in the same cellblock as defendant at the county jail. He testified that defendant frequently talked about killing his girlfriend. According to Mohmod, defendant said he had argued with her about her sleeping with a guy she worked with at a nursing home, and he slashed her with a knife while she was in the back seat of his car with her daughter, injuring his hand in the process.

Defendant also told Mohmod that after he killed his girlfriend, he brought her daughter home and went to Atlantic City, where he was kicked out of Caesars because he was bleeding. Defendant claimed that when he was arrested, he had been beaten and tasered.

Mohmod further testified that defendant described the killing in detail on two occasions. Initially, defendant said his girlfriend first swung the knife at him from the backseat. Defendant stated that he grabbed the knife and started stabbing her.

---

[2] Prior to trial, defendant moved to suppress the statements he made to Ervin and Lemons, arguing that they failed to inform him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The trial court conducted an evidentiary hearing and denied the motion. The court found that Miranda warnings were not required because Ervin and Lemons did not conduct an interrogation.

A-5136-17

Later, defendant said his girlfriend had been screaming at him from the backseat of the car. Defendant said he started hacking at her with a knife and yelling at her to "shut the fuck up." He stated that when he was finished slashing her, her face was falling off. He pushed her out of the car and, according to defendant, she said "are you happy, now? You killed me. Or something to that effect."

Mohmod also testified that he witnessed defendant get a tattoo of a dagger with his girlfriend's initials on the hilt. He stated that while defendant was getting the tattoo he was "laughing about it and saying, 'I'll always have this bitch with me, or something like that.'" Mohmod said he had asked defendant if he missed his girlfriend. According to Mohmod, defendant responded "naw, we had good sex, but she was a bitch, and she got what she deserved," and he would do it again if he could.

At trial, defendant pursued a passion-provocation defense. He did not deny that he killed Bongco, but maintained that the State did not meet its burden of proving purposeful or knowing murder. In addition to the previously discussed evidence, defendant relied upon testimony from Maria about an incident when Bongco brandished scissors and threatened to kill her.

A-5136-17

Defendant also relied on another incident during which Bongco damaged her bedroom door with an axe. However, Maria downplayed the seriousness of these incidents. She stated that defendant frequently screamed at her and argued with her mother.

Testimony also revealed that scissors were found in Bongco's shirt pocket, along with a marker and three pens. However, the scissors were safety scissors, with plastic-covered ends, and they are used to remove bandages from patients without causing injury. Blood was found on the scissors, but samples of the blood were not taken.

The jury found defendant guilty of all charges. Defendant was thereafter sentenced to an aggregate eighty-year term of incarceration, with a sixty-three-year, nine-month, period of parole ineligibility. The judge filed a JOC dated April 16, 2018. This appeal followed.

On appeal, defendant raises the following arguments for our consideration:

> POINT I
> THE COURT ERRED IN FAILING TO EVALUATE WHETHER [DEFENDANT] WAS COMPETENT TO STAND TRIAL.
>
> A. It is the Court's duty to Ensure That Only Competent Defendants Are Tried.

B. The Court Erred Both Procedurally and Substantively by Failing to Hold a Hearing but Suggesting (Informally and at the Close of Trial) that [defendant] Was Competent.

C. Because the Duty to Ensure Competence Rests Ultimately With the Court and Because Trial While Incompetent Can Neither Be Acquiesced to Nor Rendered Harmless, Counsel's Failure to Request a Hearing Below Does Not Preclude Relief.

POINT II
THE ADMISSION OF UNINTELLIGIBLE TESTIMONY, DISCERNED FOR THE FIRST TIME WHEN THE PROSECUTOR REPEATED IT DURING CLOSING ARGUMENTS, DEPRIVED [DEFENDANT] OF HIS CONFRONTATION CLAUSE AND DUE PROCESS RIGHTS, AND CONTRAVENED THE NEW JERSEY RULES OF EVIDENCE.

A. The Defense's Inability to Object, Request a Contemporaneous Limiting Instruction, or Perform Cross-Examination on the Inaudible Testimony Created Constitutional Error.

B. The testimony was inadmissible under State v. Rose[, 206 N.J. 141 (2011)].

C. The Same Circumstances Which Produced the Error Preclude a Harsh Standard of Review.

POINT III
THE CUMULATIVE IMPACT OF THE ERRORS DISCUSSED IN THE FOREGOING SECTION, WHEN COMBINED WITH ADDITIONAL EVIDENTIARY AND PROCEDURAL ERRORS, DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

10

A.    The Doctrine of Cumulative Error.

B.    Additional Evidentiary Errors.

C.    Denial of the Right to Monitor the Proceedings.

POINT IV
BECAUSE [DEFENDANT] RECEIVED A 79-YEAR
SENTENCE WITHOUT A COMPLETE PRE-
SENTENCE REPORT, THE CASE MUST BE
REMANDED FOR RESENTENCING.  (Not raised
below).

II.

Defendant first argues that the trial judge erred by failing to evaluate, sua sponte, whether he was competent to stand trial.  Defendant contends the judge was required to conduct an evidentiary hearing and determine whether he was competent, and counsel's failure to request a competency hearing does not preclude relief.  He contends his conviction should be set aside and the matter remanded for a new trial.

It is well established that "the criminal trial of an incompetent defendant violates due process."  Cooper v. Oklahoma, 517 U.S. 348, 354 (1996) (quoting Medina v. California, 505 U.S. 437, 453 (1992)).  Furthermore, New Jersey law provides:  "No person who lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the

11

commission of an offense so long as such incapacity endures." N.J.S.A. 2C:4-4(a).

The standard for determining competency is set forth at N.J.S.A. 2C:4-4(b), which provides, in pertinent part:

> A person shall be considered mentally competent to stand trial on criminal charges if the proofs shall establish:
>
> (1) That the defendant has the mental capacity to appreciate his presence in relation to time, place and things; and
>
> (2) That his elementary mental processes are such that he comprehends:
>
>   (a) That he is in a court of justice charged with a criminal offense;
>
>   (b) That there is a judge on the bench;
>
>   (c) That there is a prosecutor present who will try to convict him of a criminal charge;
>
>   (d) That he has a lawyer who will undertake to defend him against that charge;
>
>   (e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;

A-5136-17

(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge . . . ; and

(g) That he has the ability to participate in an adequate presentation of his defense.

N.J.S.A. 2C:4-5 establishes the procedures to be followed should the trial court have "reason to doubt the defendant's fitness to proceed . . . ," whether such doubt is raised by the prosecutor, defense counsel, or on the court's own motion. (emphasis added). See State v. Harris, 181 N.J. 391, 457-58 (2004).

A hearing on a defendant's competency is mandated only if there is no psychological report prepared pursuant to N.J.S.A. 2C:4-5, or if the parties contest the findings of the report. N.J.S.A. 2C:4-6(a). Once the issue of competency has been raised, the State bears the burden of proving a defendant's competency by a preponderance of the evidence. State v. McNeil, 405 N.J. Super. 39, 49 (App. Div. 2009); State v. Purnell, 394 N.J. Super. 28, 47 (App. Div. 2007).

A trial court's failure to order an inquiry into a defendant's competence will constitute reversible error only if the defendant shows, by clear and convincing evidence, that there existed a bona fide doubt as to his or her competence to stand trial. Harris, 181 N.J. at 458; State v. Spivey, 65 N.J. 21, 37 (1974); State v. Lucas, 30 N.J. 37, 73-74 (1959). This standard of review "is

consistent with the view that defense attorneys are in a better position to assess a defendant's competency; it is they who should bring such matters to the court's attention." Harris, 181 N.J. at 458.

We are convinced that the record does not raise a bona fide doubt about defendant's competence to stand trial. To the contrary, the record shows that defendant met the statutory standard for competency, N.J.S.A. 2C:4-4, and there was no reason for the trial court to doubt defendant's fitness to proceed such that it should have, on its own motion, followed the procedures set forth at N.J.S.A. 2C:4-5 and -6.

The record shows that defendant engaged in disruptive conduct during pretrial hearings, jury selection, the trial, and the sentencing hearing. At times, defendant spoke on the record without being called upon. He made derogatory comments to the court, the prosecutor, and counsel. The judge removed defendant from the courtroom on numerous occasions, added security officers to the courtroom, and held defendant in contempt.

We note, however, defendant acted in an inappropriate and disruptive manner in the presence of prospective or trial jurors only on a few occasions. Furthermore, on only a few of these occasions was defendant's behavior so

14

disruptive that the judge was compelled to excuse the jurors or removed defendant from the courtroom.

Nevertheless, defendant's comments on the record reflect his orientation to time, place, and things, and his understanding that he was on trial for criminal offenses, with a jury to consider his guilt or innocence. N.J.S.A. 2C:4-4(b)(1) and (2)(a) and (f). He also demonstrated an understanding that the judge controlled the courtroom, the prosecutor was presenting evidence to convict him, and his attorney was responsible for defending him. N.J.S.A. 2C:4-4(b)-(d).

The record further indicates that defendant understood he had the right to testify. N.J.S.A. 2C:4-4(e). The judge engaged in colloquies with defendant regarding this right, and he expressed an understanding of the right. He stated that he wanted to testify, but he refused to do so as long as he was represented by his assigned counsel.

The record also indicates that defendant had the capacity to assist in his own defense. N.J.SA. 2C:4-4(b)(2)(g). The question is whether the defendant is capable of assisting counsel in "such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc." State v. Gorthy, 226 N.J. 516, 531 (2016) (quoting Aponte v. State, 30 N.J. 441, 453

15

(1959)).  The inquiry turns on whether a defendant's "mental condition precludes meaningful interaction with his or her attorney with respect to the pending charges and the trial."  Id. at 531-32.

Here, defense counsel indicated that defendant often refused to speak with her.  However, the record shows that defendant was not only capable of assisting in his own defense, but he did so actively.

We further note that before trial, defense counsel filed a motion for defendant to proceed pro se, asserting that defendant was "competent to conduct his own defense."  The judge denied the application, not because of any concerns about defendant's competency, but because defendant did not state on the record that he wanted to represent himself.

The judge's comments also support the conclusion that there was no bona fide concern about defendant's competence.  See Drope v. Missouri, 420 U.S. 162, 181 (1975) ("a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial"); Purnell, 394 N.J. Super. at 49 ("even if a competency determination is made, the court has a continuing obligation to revisit the issue if warranted by further information as the proceedings progress").

16

The judge's remarks indicate that she believed, based on her own observations, that defendant's inappropriate conduct was intentional, and he was acting with the purpose to delay and disrupt the trial. The judge was not convinced defendant was suffering from a mental health defect. Rather, defendant was merely being disrespectful and combative. The judge noted that defendant understood what was taking place during the proceedings. She noted that defendant had behaved himself when the court ruled in his favor and only acted out when damaging evidence was admitted, or when the court ruled against him.

Finally, defendant does not contend he suffers from any cognitive limitations. In addition, nothing in the record indicates that defendant was suffering from a mental illness.

In support of his argument, defendant relies in part upon Maria's trial testimony. She stated that during the two years she lived with defendant and her mother, her mother told her on one occasion that defendant was "on his medication" and behaving in a way that made her frightened. Maria told defendant to leave. She testified that she thought defendant was not acting "like . . . himself," and she called 9-1-1.

A-5136-17

Defendant recognizes that this single incident was never explored during the trial, and there is nothing in the record concerning the medication defendant may have been taking at the time of incident or whether he was still taking it. In any event, Maria's testimony did not raise a bona fide issue of defendant's competency. Her testimony provides no support for defendant's contention on appeal that the judge erred by failing to conduct a hearing on his competence to stand trial.

III.

Next, defendant argues he was denied a fair trial because the trial judge erred by admitting portions of testimony by Achetouane, McKeown, Ervin, and Lemons.

We review the trial court's evidentiary rulings under an abuse of discretion standard. State v. Jackson, 243 N.J. 52, 64-65 (2020); State v. Nantambu, 221 N.J. 390, 402 (2015). Where no objection is raised in the trial court, we review the evidentiary ruling for plain error, meaning an error that is "clearly capable of producing an unjust result." R. 2:10-2; State v. Trinidad, 241 N.J. 425, 445 (2020).

The plain error standard creates a "high bar." State v. Santamaria, 236 N.J. 390, 404 (2019). It requires reversal "only where the possibility of an

injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Trinidad, 241 N.J. at 445 (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

A. Achetouane.

At trial, the prosecutor questioned Achetouane about his interactions with defendant. Among other things, Achetouane stated that defendant had once sent him a text message, which said "something like you are dead." In response to further questions, Achetouane said he had received the threatening text message from defendant after Bongco was killed.

Defense counsel was aware of defendant's text messages to Achetouane because they had been produced in discovery. Nevertheless, defense counsel did not object to this testimony, nor did she address this issue on cross-examination. Instead, on cross-examination, defense counsel elicited testimony that on the day Bongco was killed, before she died, Achetouane had received several text messages from defendant about "the issue of possible cheating."

During closing arguments, the prosecutor referred to defendant's threatening text message to Achetouane. After the attorneys had completed their arguments, the judge discussed the threatening text message with counsel. The judge pointed out that she had difficulty understanding Achetouane's testimony

19

due to his accent, and she did not hear his testimony about the threatening text message.

The judge observed that defendant's attorney did not object to the testimony and that may have been part of defendant's passion-provocation defense. The judge offered defense counsel an opportunity to object to the testimony; however, defense counsel noted that she did not object to the testimony when it was given, and she declined to do so after-the-fact. Nevertheless, the judge stated that she planned to issue an instruction to the jury.

The following day, the judge again discussed the issue with counsel. Defendant's attorney opposed an instruction to the jury telling it to disregard the testimony and expressed a concern that such an instruction would highlight the testimony for the jury.

Defense counsel also moved for a mistrial, which the judge denied. The judge noted that defense counsel had not objected to the testimony or the prosecutor's comment in summation, and counsel did not make a motion to bar the evidence. Ultimately, the judge instructed the jury to disregard the testimony about the text message. The judge told the jury it "should not mention that testimony nor should you consider it during your deliberations."

 A-5136-17

On appeal, defendant argues he was denied his constitutional right to confront Achetouane because his attorney was unable to hear or discern the testimony about the alleged threat, due to Achetouane's accent. Defendant contends his attorney could not engage in effective cross-examination and was unable to register contemporaneous objections to the testimony. He argues that the "constitutional violation" is even more severe if some members of the jury heard the testimony and others did not.

These contentions are unavailing. Defendant was not deprived of the right to confront Achetouane because Achetouane spoke with an accent and defense counsel may not have heard or understood his testimony. Defendant's attorney could have objected to the testimony on the ground that it was unintelligible or sought clarification on cross-examination. Defense counsel also could have objected when the prosecutor mentioned the threatening text in summation.

We are convinced the trial court did not err by denying defendant's motion for a mistrial and instructing the jury to disregard the testimony regarding the threatening text message. Achetouane's testimony was brief and defense counsel's failure to object to the testimony or the prosecutor's comment in summation, indicates that counsel did not deem the testimony unduly prejudicial. See State v. Frost, 158 N.J. 76, 83-84 (1999) (noting that the failure

21

to object to allegedly improper remarks by the prosecutor "suggests that defense counsel did not believe the remarks were prejudicial at the time they were made").

Even if the admission of the testimony was erroneous, it would not have "led the jury to a result it otherwise might not have reached." Trinidad, 241 N.J. at 445 (quoting Macon, 57 N.J. at 336). As we have explained, the evidence that defendant killed Bongco, which includes his own incriminating statements, was overwhelming.

Finally, the judge properly addressed the matter by issuing a curative instruction. As noted, the judge instructed the jury to disregard the testimony in its discussions and deliberations. The jury is presumed to have followed the court's instructions. Santamaria, 236 N.J. at 412-13.

B. McKeown.

Defendant contends the judge erred by permitting Detective Matthew McKeown to testify that defendant adopted a fighting stance when the police confronted him in his Atlantic City hotel room. Defendant's counsel did not object to the testimony. Therefore, we consider whether the admission of the testimony was plain error.

22

The record shows that the testimony at issue was admitted when defendant's attorney questioned McKeown. Defense counsel did not object to McKeown's testimony, nor did she ask that it be stricken. Instead, defense counsel sought to challenge the statement by asking McKeown additional questions. In response to those questions, McKeown admitted he did not personally observe defendant take a fighting stance, and his statement was based upon what other officers said.

We are convinced that even if the admission of McKeown's statement was erroneous, it was not an error "clearly capable of producing an unjust result." R. 2:10-2. The facts concerning defendant's arrest were largely undisputed, and they were not material to any issue in the case. Moreover, as stated previously, there was overwhelming evidence that defendant committed the charged offenses.

C. Ervin and Lemons.

Defendant contends the judge erred by allowing Ervin and Lemons to testify that they were not legally required to issue Miranda warnings to defendant while they were guarding him in the hospital. Defendant contends these two witnesses improperly provided legal opinions.

23

At trial, Ervin and Lemons both recounted the incriminating statements defendant made while they were guarding him at the hospital. During cross-examination, defense counsel suggested that both witnesses were lying about what defendant had said to them. Counsel also suggested the officers had a legal or ethical obligation to issue <u>Miranda</u> warnings to defendant or otherwise caution him against speaking to them.

The prosecutor explored the issue further when questioning Evans and Lemons on re-direct. The prosecutor asked the witnesses whether, under the circumstances, they had a legal duty to issue <u>Miranda</u> warnings. They testified that they did not have such a duty. Defense counsel further pursued the issue with both witnesses and raised no objection to their testimony.

However, when the prosecutor mentioned the Evans and Lemons' testimony in his summation, defense counsel objected to any references to what defendant did <u>not</u> say to the officers. In the context of that objection, defense counsel said she had raised the <u>Miranda</u> issue with both officers, noting that her "whole argument" with respect to these officers was that they "didn't give <u>Miranda</u> warnings."

We are convinced that even if the trial judge erred by allowing Ervin and Lemons to testify that they were not obligated to issue <u>Miranda</u> warnings to

24

defendant, the error was not "clearly capable of producing an unjust result." R. 2:10-2. As noted, defense counsel raised the Miranda issue in her cross-examination of these witnesses, in an apparent effort to challenge the credibility of the officers' testimony as to what defendant said while they were guarding him.

Also, the officers' testimony about the duty to issue Miranda warnings had little bearing on any material issue in the case. The testimony also was consistent with the trial court's pre-trial ruling on defendant's suppression motion. As noted previously, the court found that the officers were not interrogating defendant while guarding him in the hospital and had no duty to issue Miranda warnings to defendant. Furthermore, there was overwhelming evidence of defendant's guilt.

IV.

Defendant contends the cumulative error doctrine requires reversal of his convictions. In support of this argument, defendant relies on: the trial court's alleged error in failing to order an evaluation of his competence: the claimed evidentiary errors involving the testimony of Achetoune, McKeown, Ervin, and Lemons; and the court's failure to allow him to monitor the trial proceedings

25

with a video feed after he was removed from the courtroom for engaging in disruptive conduct.

Under the cumulative error doctrine, the court may reverse a defendant's conviction when "any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial . . . ." State v. Terrell, 452 N.J. Super. 226, 308 (App. Div. 2016) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954), aff'd o.b., 231 N.J. 170 (2017)).

As stated previously, we found no error in the court's failure to order a competency examination and her evidentiary rulings. We also find no merit in defendant's argument that the judge should have permitted him to monitor the courtroom proceedings by video feed after he had been removed for disruptive conduct.

The judge noted that there was no recording mechanism in the holding cell, and it would be prejudicial to defendant if he were seen watching the proceedings from a holding cell. In addition, defense counsel opposed a video feed because the jury might infer that defendant did not have a constitutional right to remove himself from the proceedings, and because it was not possible to have a video feed without the jury knowing he was in a cell.

A-5136-17

The invited error doctrine applies to defendant's argument. The doctrine precludes defendant from arguing, as he does here, that the trial court erred, when his attorney "urged the lower court to adopt the proposition now alleged to be error." State v. A.R., 213 N.J. 542, 561 (2013) (quoting N.J. Div. of Youth & Fam. Servs. v. M.C., III, 201 N.J. 328, 340 (2010)).

The argument is, however, entirely without merit. As we have explained, defendant repeatedly acted in a disruptive manner during the trial and, as a consequence, he was removed from the courtroom. He essentially forfeited his right to be present during the trial.[3]

After he was removed from the proceedings, defendant had no legal right to participate in the trial by audio or video transmission. See Bell v. Evatt, 72 F.3d 421, 432 (4th Cir. 1995); People v. Mayham, 212 Cal. App. 4th 847, 856-57 (Ct. App. 2013); People v. Young, 838 N.Y.S.2d 550, 551 (App. Div. 2007); People v. Smith, 784 N.Y.S.2d 530, 531-32 (App. Div. 2004). Rather, the issue is left to the court's discretion. People v. Hendrix, 883 N.Y.S.2d 534, 535 (App. Div. 2009).

---

[3] It should be noted that defendant also was removed temporarily from the sentencing proceeding due to his disruptive conduct. However, the court arranged for him to view that proceeding through an audio/video feed.

We are convinced the trial judge did not abuse her discretion by refusing to arrange for an audio/video transmission of the trial proceedings for defendant, after he was removed due to his disruptive conduct. As the judge explained, if the proceedings were transmitted by an audio/video feed, defendant would be seen observing the proceedings from his holding cell and this would prejudice his right to a fair trial.

V.

Defendant also argues that the judge erred by sentencing him to a seventy-nine-year prison term without a complete presentence report (PSR). He contends the matter should be remanded for resentencing.

Here, the trial judge found four aggravating factors: the nature and circumstances of the offense and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner, N.J.S.A. 2C:44-1(a)(1); the risk of re-offense, N.J.S.A. 2C:44-1(a)(3); the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9); and the offense involved an act of domestic violence, N.J.S.A. 2C:44-1(a)(14).

The judge found one mitigating factor: that defendant had no history of prior delinquency or criminal activity or had led a law-abiding life for a substantial period of time before the commission of the present offense, N.J.S.A.

28

2C:44-1(b) (7), noting however that defendant did have prior involvement with the criminal justice system.

The judge found that both qualitatively and quantitatively the aggravating factors clearly, convincingly, and substantially outweighed the mitigating factors.

The judge merged count two (possession of a weapon for an unlawful purpose) with count one (murder) and sentenced defendant on count one to: seventy-five years for murder (count one), subject to the No Early Release Act, NERA, N.J.S.A. 2C:43-7.2. The judge also sentenced defendant to a concurrent eighteen-month term for unlawful possession of a weapon (count three); and a five-year consecutive term for endangering the welfare of a child (count four).

As noted, defendant argues that the judge erred by sentencing him without first obtaining a complete PSR. The criminal code provides in pertinent part that "[t]he court shall not impose sentence without first ordering a presentence investigation of the defendant and according due consideration to a written report of such investigation when required by the Rules of Court." N.J.S.A. 2C:44-6(a). See also R. 3:21-2(a) ("Before the imposition of a sentence or the granting of probation court support staff shall make a presentence investigation in accordance with N.J.S.A. 2C:44-6 and shall report to the court.").

29

N.J.S.A. 2C:44-6(b) requires the PSR to include of all material that may have a bearing on the sentence, which includes the defendant's criminal history, family situation, financial resources, employment history, and personal habits. The statute further provides that "[i]n any case involving a conviction of N.J.S. 2C:24-4, endangering the welfare of a child . . . the investigation shall include a report on the defendant's mental condition." Ibid.

On appeal, defendant asserts that the PSR did not include a report on his mental condition, nor information concerning his: residence; family history, family situation, and contacts; health status; physical appearance; any substance abuse and treatment history; medical history; mental health history; any psychological evaluations; employment history; financial status; and education.

He argues that the information provided in the PSR regarding the factors contributing to the present offense, and his personality and problems, was so sparse as to be considered "functionally blank." The PSR states that defendant did not wish to provide personal information for the report, and he "did not relate any contributing factors for the present offense."

In arguing that the PSR was inadequate and resentencing required, defendant relies upon State v. Richardson, 117 N.J. Super. 502, 506 (App. Div. 1971). In that case, this court vacated the defendant's sentences and remanded

the matter for resentencing because the defendant had been sentenced without a mandatory presentence report having been prepared.

In Richardson, the probation officer had visited the defendant for an interview, but the defendant chose not to answer any questions, indicated he had nothing to say, and declined to discuss the matter. Id. at 504. At sentencing, the court told the defendant a complete PSR might be helpful to him, but the defendant said he was not interested and wished to be sentenced without the report. Ibid.

This court held that the State had not complied with the relevant statute and court rule. Ibid. The court observed that the defendant's refusal to cooperate with and give a statement to the probation officer did not excuse the officer from using other resources to complete the investigation. Id. at 505. We rejected the State's argument that the defendant had forfeited his right to a presentence investigation and report. Id. at 505-06.

We are convinced, however, that defendant's reliance upon Richardson is misplaced. As noted, in Richardson, no PSR was prepared. Here, a PSR was prepared but some information was missing. In addition, the officer who prepared the report for this case considered other sources of information. The PSR thus contains defendant's personal identifying information, his criminal

31

record, summary of the State's allegations, and special factors related to the offenses.

We are not convinced the alleged deficiencies in defendant's PSR warrant resentencing. As noted, defendant did not provide any personal information for the report or his version of the offense. Further, defendant's cooperation was required for the preparation of a report concerning his mental condition. See State v. Capano, 125 N.J. Super. 383, 396 (App. Div. 1973) (noting that the defendant cold not take advantage of a situation "of his own creation").

We also note that at sentencing, defense counsel did not object to the PSR and noted that defendant had reviewed the report. Defendant addressed the court. He made various allegations about the judicial system, the trial, and the evidence; however, he did not provide any information that would otherwise have been included in the PSR.

Nevertheless, we are convinced the matter must be remanded for resentencing. As noted, the trial court sentenced defendant to a consecutive term of five years for endangering the welfare of a child. In imposing that sentence,

the judge noted that she had considered the factors for consecutive sentences set forth in State v. Yarbough, 100 N.J. 627, 643-45 (1985).[4]

In reviewing the Yarbough factors, the judge noted that the endangering offense involved J.F., who was a separate victim. The judge explained that at age five, J.F. had watched the brutal murder of her mother. She was covered in blood and faced the threat of physical injury. The judge observed that J.F. had undoubtedly suffered a psychological injury that required treatment. The judge pointed out that J.F. was still having nightmares and suffering emotional problems. The judge concluded that a consecutive sentence was warranted.

We note, however, that while this appeal was pending, our Supreme Court issued its opinion in State v. Torres, __ N.J. __, __ (2021), and again addressed the standards for imposing consecutive sentences. The Court stated that Yarbough requires the trial court to place on the record a statement of reasons for imposing consecutive sentences, which should address the overall fairness of the sentence. Id. at __ (slip op. at 26) (quoting State v. Miller, 108 N.J. 112, 122 (1987)). The Court held that "[a]n explicit statement, explaining the overall

---

[4] Yarbough established six factors to guide the trial courts in imposing consecutive sentences. The sixth factor, which imposed an overall outer limit on the cumulation of consecutive sentences, was later superseded by the Legislature. L. 1993, c. 233, § 1.

fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings, is essential to a proper Yarbough sentencing assessment." Id. at __ (slip at 27) (citing Miller, 108 N.J. at 122).

As noted, in this case, the trial court provided detailed reasons for imposing a consecutive sentence but did not address the overall fairness of the sentences. We therefore remand for resentencing in light of Torres.

On remand, defendant should again be given the opportunity to provide relevant information for the PSR. He should be given the opportunity to participate in any evaluation required for the preparation of a report of his mental condition and provide other information to address those sections of the PSR where his cooperation is required. Defendant's counsel also should be permitted an opportunity to supplement the PSR.

Affirmed in part and remanded in part for resentencing in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5136-17